**Gail M. KRANSON, Administratrix of the Estate of Harry Gritz, Deceased, Appellant,**

v.

**VALLEY CREST NURSING HOME, a/k/a Luzerne County Institution District, Appellee.**

No. 84–5255.

United States Court of Appeals, Third Circuit.

Argued Nov. 27, 1984.

Decided Feb. 12, 1985.

48

David I. Fallk (argued), Barristers' Row, Ltd., Scranton, Pa., for appellant.

George A. Spohrer (argued), Hourigan, Kluger, Spohrer & Quinn, P.C., Wilkes-Barre, Pa., for appellee.

Before HUNTER and WEIS, Circuit Judges, and THOMPSON, District Judge.*

## OPINION OF THE COURT

WEIS, Circuit Judge.

Plaintiff sued a municipally owned nursing home for the death of her father. She charged a violation of his constitutional rights because of a failure to administer cardiopulmonary resuscitation, allegedly as a result of an institutional policy to withhold such treatment. The district court granted a directed verdict against plaintiff because she did not show that the policy was unconstitutional nor did she demonstrate a causal relationship between the policy and the injury. We will affirm on the lack of a causal nexus.

As administratrix of her deceased father's estate, plaintiff brought this suit under § 1983 for violation of constitutional rights and under state law for wrongful death based on negligence. The district court dismissed the negligence count before trial. At the conclusion of the plaintiff's evidence at trial of the federal claim, the district judge directed a verdict in favor of defendant.

The plaintiff's decedent, Harry Gritz, died in August 1980 while a patient at the Valley Crest Nursing Home operated by Luzerne County, Pennsylvania. Mr. Gritz was then sixty-six years of age and was suffering from the effects of a stroke. He was a diabetic and had had a pacemaker implanted. The diagnosis on admission was congestive heart failure, old C.V.A. (cardiovascular accident), diabetes, and chronic coronary insufficiency. Mr. Gritz was paralyzed in his right arm and had only partial use of his left arm. He was unable to ambulate, bathe, dress, or shave without assistance.[1]

Five days after his admission to Valley Crest, Mr. Gritz choked on a piece of meat while eating his evening meal. Mr. Pozda, a practical nurse who was nearby, attempted to aid Mr. Gritz by slapping him between the shoulder blades. When that proved ineffective, a nurse and another attendant nearby assisted by holding Mr. Gritz upright while Pozda performed the Heimlich maneuver.[2] The first effort was unsuccessful, but on a second application, the obstruction was forced upward into the plaintiff's mouth. Mr. Pozda removed the piece of meat, and Mr. Gritz was reseated in the wheelchair. At that time his pupils were fixed and dilated. He had no carotid pulse.

A physician who had been summoned, arrived as Mr. Gritz was being wheeled to his room or shortly after he arrived there. The physician pronounced the patient dead. The record shows that after the Heimlich

---

* The Honorable Anne E. Thompson, United States District Judge for the District of New Jersey, sitting by designation.

1. The medical history of Mr. Gritz that Valley Crest personnel prepared shortly before his admission discloses the following:

"Mr. Gritz is presently a patient in Allied Services having been admitted April 18, 1980 for rehabilitation. He had previously been admitted to the Mercy Hospital, Wilkes-Barre, Pennsylvania, on February 18, 1980 with severe dyspnea,

swelling of ankles, weakness and inability to walk.

"Past history consists of two attacks of myocardial infarction, two or three cerebrovascular accidents, and two occasions of congestive heart failure. He is also a known diabetic."

2. To perform this maneuver, the nurse's aide stood behind Mr. Gritz and applied pressure to the upper abdomen forcing air from the diaphragm up through his air passages.

maneuver was performed, no other resuscitative procedures were employed.

Plaintiff contends that cardiopulmonary resuscitation should have been administered to the patient after the piece of meat had been dislodged from his throat. She asserts that the failure to pursue that process was the result of the nursing home's policy not to administer cardiopulmonary resuscitation in every instance in which it was not specifically requested in advance by the patient or his family.

Some time before Mr. Gritz had been admitted, the nursing home, in a memorandum prepared by its medical director, had put forward the following position: "... with the appreciation of diverse opinion, based on philosophical, religious and humanitarian issues, it is impossible to have an absolute policy regarding CPR in this institution." However, the memorandum presented the following suggestions as guidelines on which to base a rational decision appropriate to a given situation.

"1. It is understood that standard C.P.R. is *not* to be performed routinely on every patient found in cardiac or respiratory arrest.

"2. When resuscitation efforts are requested by the patient or family prior to an unforeseen arrest, this information should be communicated to the physician in charge so that the appropriateness of the request in relationship to the patient's medical condition can be discussed with the family. A specific written order can then be placed on the chart by the physician.

"3. When medical[ly] appropriate, a physician may request C.P.R. upon cardiac or respiratory arrest by placing a written order on the patient's medical chart. Verbal orders may also be taken in emergency situations.

"4. When an unexpected cardiac or respiratory arrest occurs in a patient considered by nursing personnel to be medically stable, who also appears to have a reasonable degree of quality of life and quantity of life, C.P.R. may be initiated at the discretion of the nurse in charge of that floor at that particular time. It is understood that best judgment will be used. The physician in charge will be notified as soon as possible."

Plaintiff testified that she was not made aware of the Home's policy on CPR. The evidence also establishes that no notation indicating that CPR should be administered had been made on Mr. Gritz's chart. After presentation of her case, plaintiff contended that she had demonstrated negligence in the treatment of Mr. Gritz and that this was sufficient to establish liability under § 1983.

The district judge, however, granted the defendant's motion for directed verdict. He stated that negligence was not enough to establish a cause of action under § 1983 against a municipal agency. Under *Monell*, a plaintiff must show a nexus between municipal policy and the deprivation of some constitutional right. The judge continued, "I find nothing in the record that would allow, in my judgment, a jury to find that policy or that custom was inappropriate under the circumstances of a nursing home or that its use was the cause of death in this case." He also ruled that although the legislature had provided for the tort immunity of a municipal agency in cases such as this, that fact did not give a constitutional gloss to what was essentially a negligence claim.

### I.

On appeal plaintiff advances a number of theories, which she maintains required submission of her § 1983 case to the jury. These ideas are not always clearly delineated or developed. She asserts that negligence on the part of the nursing home employees was enough to establish a § 1983 case—indeed that the evidence showed callous indifference. She also contends that the home failed to notify the decedent and his family of the CPR policy.

Defendant argues that plaintiff has not clearly articulated the constitutional violation that is alleged to have occurred and emphasizes that the decedent voluntarily chose to become a patient at the municipal

nursing home. Unlike a prisoner or involuntarily committed mental patient, the plaintiff's decedent was free to leave. Defendant maintains that the element of voluntary commitment present in this case negates the duty of care placed on state institutions in situations of involuntary detention.

Plaintiff attempts to raise provocative issues requiring wide-ranging and thoughtful consideration of the policies of health care facilities, the type of care they give to their patients, and particularly the use of certain life sustaining procedures. Measures which may be required for elderly patients in comparatively good health may not be desirable for those with painful, terminal illness. In other instances, heroic treatment may not insure "life" but rather only a vegetative existence, a condition not desired by either the patient or his family.[3] What the Constitution requires of governmental institutions in situations of that nature is a matter which demands the most careful attention of the courts.

▇▇▇ The record in this case, however, does not properly present such profound matters for our attention because plaintiff has failed to establish the essential link between policy and injury. In the posture of this case, we must be mindful of our obligation to avoid constitutional issues where an alternative ground of decision is present. *Hagans v. Lavine*, 415 U.S. 528, 543, 94 S.Ct. 1372, 1382, 39 L.Ed.2d 577 (1974); *Ashwander v. T.V.A.*, 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

▇▇▇ We begin with the basic premise that local municipalities are not liable for the constitutional transgressions of their officers and employees on a *respondeat superior* theory. In *Monell v. Department of Social Services of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978), the Supreme Court held that local governing bodies could be liable under § 1983 only when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers."

Plaintiff points to the CPR policy of the nursing home as forming the predicate for her claims against this local governmental agency. Although she bases her case on this document, much of the confusion and uncertainty of her claims apparently springs from a reluctance to accept the policy as written.

In her brief, plaintiff refers to the defendant's "policy not to provide resuscitative measures." In another sentence she says that defendant "cannot defend that part of its policy which preempts a decision by the medical staff if CPR is requested by a patient or his family." But these excerpts from her brief are not accurate statements of the policy. The parties agree that the document entitled "CPR Policy" introduced into evidence contains the terms of the policy. The exhibit clearly states that "it is impossible to have an absolute policy regarding CPR in this institution...."

The guidelines do state that CPR is not to be performed "routinely." If the patient or family does request such a procedure in advance, a consultation with the physician in charge is arranged and depending on its outcome, a written order can be placed on the patient's chart. Even without a request, a physician may enter such an order or may issue an oral order in an emergency situation. In other unexpected situations, the nurse in charge of the floor may issue an order in the exercise of "best judgment."

It may be seen that the policy does not forbid use of CPR, but simply provides guidelines for exercise of discretion by medical personnel. In the context of the record here, it is important that the terms

---

**3.** For a general discussion of some of the difficult legal issues raised by life prolonging medical technology, *see In re: L.H.R.*, 253 Ga. 439, 321 S.E.2d 716 (1984); *Superintendent of Belch-* ertown States School v. Saikewicz, 373 Mass. 728, 370 N.E.2d 417 (1977); *Matter of Quinlan*, 70 N.J. 10, 355 A.2d 647 (1976).

of the policy be clearly understood because it is only "when execution of a government policy ... inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037–38.

In *Losch v. Borough of Parkesburg,* 736 F.2d 903, 910 (3d Cir.1984), we applied the *Monell* standard in holding that a municipality could not be found liable for constitutional violations allegedly committed by municipal police officers. "A plaintiff must identify the challenged policy, attribute it to the city itself, and show a causal link between execution of the policy and the injury suffered."

The necessity of meeting the causation standard of *Monell* was also discussed in *Bennett v. City of Slidell,* 728 F.2d 762, 767 (5th Cir.1984), a case cited with approval in *Losch.* There the court held that to prevail in a § 1983 claim against a local governmental agency the plaintiff must "show that the particular injury was incurred because of the execution of that policy." *See also Black v. Stephens,* 662 F.2d 181, 191 (3d Cir.1981) (requiring a "causal nexus between" municipal regulation and the wrongful act).

■ Thus, the carelessness of an employee in failing to follow a policy or in misunderstanding its meaning may establish the negligence of the employee but does not fasten liability on the governmental agency. The injury must occur as a result of the implementation of the program.

The plaintiff's case is based in part on the fact that she was not notified of the policy. But that amounts to nothing more than a failure on the part of the nursing home personnel. The policy itself did not direct that its terms should be concealed from either family or patients. The evidence is otherwise, demonstrating that Valley Crest's practice was to inform patients and families. Consequently, proof of a failure to inform in one particular instance cannot form the basis of a § 1983 claim in light of *Monell.*

Within the few minutes that followed the clearing of the obstruction, Mr. Gritz was attended by a number of nursing personnel and by Dr. Brown. According to the plaintiff's brief, none of them took any action to restore Mr. Gritz's vital signs. Even assuming that factual basis, and that such inaction would amount to negligence, it would not establish *Monell* liability against the nursing home unless that conduct was in execution of the policy.

Plaintiff presented the testimony of two of the nursing attendants and Dr. Brown. Mr. Pozda was the practical nurse who first noticed Mr. Gritz in difficulty and ultimately dislodged the obstruction. Mr. Pozda testified he was unaware of the CPR policy. Dr. Brown testified to the same effect. Obviously, therefore, since they did not know the policy, their actions were not taken to implement it.

Mr. Fretti later assisted nurse Pozda. During his testimony, he was asked "when he was to or not to perform CPR" and he replied, "there was no CPR." If that answer is to be taken as statement of the policy, it is obviously incorrect. As we have noted earlier, no such absolute policy existed. Instead of a flat prohibition, the home adopted guidelines to facilitate "a rational decision ... appropriate to a given situation." Although CPR was not to be performed "routinely," discretionary use was permissible. Nurse Fretti clearly misunderstood the policy. If he failed to administer CPR because of an incorrect interpretation, that does not establish the nursing home's liability under *Monell.*

Dr. Brown also pointed out that CPR might dislodge the electrode on the decedent's pacemaker and thus deprive his heart of the electrical stimulation it was receiving. Thus CPR, rather than assisting the patient, would quite possibly deny him the assistance that the pacemaker was providing to his heart, albeit apparently ineffectively. Dr. Brown also discussed the minimal probability of successful resuscitation of patients with severe cardiovascular disabilities such as those which Mr. Gritz suffered.

After a most careful review of the record, we find ourselves in agreement with the trial judge's conclusion that plaintiff failed to show the requisite causation between the defendant's policy and the alleged violation of constitutional rights.

## II.

Before trial the district court entered partial summary judgment in favor of defendant on the plaintiff's pendent negligence claim against the nursing home. The judgment was based on the state's Political Subdivision Tort Claims Act, 42 Pa.Cons.Stat.Ann. §§ 8541–64. This statute provides that with the exception of eight specific areas, not pertinent here, a political subdivision is not liable for "any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof." 42 Pa.Cons.Stat.Ann. § 8541. Under the terms of the statute, local agencies are immune from suits alleging medical malpractice or the negligence of employees in municipally owned health care facilities.

Another statute, the Sovereign Immunity Act, 42 Pa.Cons.Stat.Ann. §§ 8521–28 operates in a similar fashion to preserve immunity for the state with certain specified exceptions. One of the exceptions applies to employees of medical institutions, or doctors, nurses and related health care personnel. 42 Pa.Cons.Stat.Ann. § 8522(b)(2). Thus, an individual may recover for injuries resulting from medical malpractice by employees of the state.

Plaintiff observes that if Mr. Gritz had been a patient in a state institution he could recover for negligence of the medical or nursing employees. She argues that this disparity in accountability between local and state governments violates the Equal Protection Clause of the United States Constitution.

■ The Equal Protection Clause does not require the state to treat all persons alike. A legislature "must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns, both public and private, and that account for limitations on the practical ability of the state to remedy every ill." *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982).

■ To succeed on an equal protection challenge, a plaintiff "must show that the allegedly offensive categorization invidiously discriminates against the disfavored group." *Price v. Cohen*, 715 F.2d 87, 91 (3d Cir.1983). The intensity of the scrutiny which reviewing courts must utilize depends on the composition of the group and the nature of the right infringed.

■ Here, the group affected consists of those who are patients in municipally operated health care institutions. This is not a suspect classification, such as one based on race, requiring the state to demonstrate a compelling reason for its action. *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *see also Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976).

■ The nature of the right is also a consideration. If it is one deemed to be constitutionally fundamental, then strict judicial scrutiny is required. *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (right to vote is fundamental). The right at stake here is the of entitlement to monetary damages for negligence, which has never been held to be a fundamental right under the United States Constitution.

■ Generally speaking, the existence of tort remedies is a matter of state law. *See Martinez v. California*, 444 U.S. 277, 281–83, 100 S.Ct. 553, 557–58, 62 L.Ed.2d 481 (1980). The state is free to create new causes of action and to abolish older ones. For example, Pennsylvania has totally abolished recovery for the common law tort of criminal conversation, *Fadgen v. Lenkner*, 469 Pa. 272, 365 A.2d 147 (1976), and for breach of promise to marry, Pa.Stat.Ann. tit. 48, § 170 (Purdon 1965). *See also Singer v. Sheppard*, 464 Pa. 387, 346 A.2d

897 (1975) (partial abrogation of cause of action in tort under the Pennsylvania No Fault Act).

■ Since the group affected is not a suspect class and the right is not fundamental, the statute must be sustained if it bears a rational relationship to a legitimate state interest. The "materiality of the relation" between legislative action and the goal sought to be attained need not be "scientifically substantiated." *Mathews v. Lucas,* 427 U.S. 495, 510, 96 S.Ct. 2755, 2764, 49 L.Ed.2d 651 (1976). "States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude." *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976).

The district court concluded that "limitation of tort liability for counties certainly bears a rational relationship to their efficient operation." In *Robson v. Penn Hills School District,* 63 Pa.Cmwlth. 250, 255, 437 A.2d 1273, 1276 (1981), the Pennsylvania Commonwealth Court found that the "Act was an attempt to stabilize the political subdivision's ability to obtain insurance coverage by defining the risks to be covered."

■ We may take judicial notice of the expanding population of the aged and the need for adequate facilities and personnel to care for them. Obviously, substantial costs are involved. It is clearly not irrational for the state legislature to conclude that providing immunity to municipally operated nursing homes is necessary to encourage their establishment and operation. The state may choose to operate on the assumption that regulation by other than the threat of damage suits will result in adequate care for their patients.

■ In sum, the statute in question as it applies in this case did not deny the decedent equal protection of the law.

We find no error in the district court's disposition of this case. Accordingly, the judgment will be affirmed.