**Joseph Todd Eric BROWN, Plaintiff-Appellant,**

v.

**CITY OF CLEWISTON and Luis Perez, Defendants-Appellees.**

No. 87–5503.

United States Court of Appeals, Eleventh Circuit.

July 13, 1988.

---

**5.** Petition for certiorari was filed February 17, 1988.

Michael A. Nugent, Cone, Wagner, Nugent, Johnson, Roth & Romano, P.A., West Palm Beach, Fla., for plaintiff-appellant.

Ralph B. Paxton, Paxton, Crow, Bragg & Austin, P.A., Michele I. Nelson, West Palm Beach, Fla., for defendants-appellees.

Before HATCHETT and EDMONDSON, Circuit Judges, and MARKEY *, Chief Circuit Judge.

EDMONDSON, Circuit Judge:

This appeal challenges the district court's grant of summary judgment in favor of defendant-appellee, the City of Clewiston, Florida ["City" or "City of Clewiston"].[1] Plaintiff-appellant Joseph Todd Eric Brown sued the City of Clewiston after one of its police officers shot Brown as he attempted to avoid arrest. Brown contends that City police authorized the use of deadly force in

---

* Honorable Howard T. Markey, Chief U.S. Circuit Judge for the Federal Circuit, sitting by designation.

1. The district court granted summary judgment in favor of defendants City of Clewiston, *Brown*

v. City of Clewiston, 644 F.Supp. 1407 (S.D.Fla. 1986), and Luis Perez, *Brown v. City of Clewiston,* 644 F.Supp. 1417 (S.D.Fla.1986). This appeal concerns *only* the grant of summary judgment in favor of the City of Clewiston.

violation of his constitutional rights, 42 U.S.C. sec. 1983, and of state law. The district court granted summary judgment against Brown on all of his claims; we affirm.

BACKGROUND:

On June 18, 1979, Officer Luis Perez, an employee of the City, received information that led him to watch an unoccupied apartment. He saw Brown break a window and crawl into the apartment to steal a stereo and other property. Thereafter, Brown left the apartment and returned to a car that was parked nearby. When Officer Perez approached and attempted to arrest Brown, Brown fled; Officer Perez shot Brown in the leg to prevent his escape.[2] Apparently, Brown was unarmed and presented no threat of death or bodily harm to Officer Perez or others. *See generally Brown v. City of Clewiston*, 644 F.Supp. 1407, 1409–10 (S.D.Fla.1986) (describing the undisputed facts surrounding the shooting incident). Also, "Perez knew who the plaintiff [Brown] was, knew that he was a juvenile and knew his address." *Id.* at 1410.

At the time of the shooting incident, a Florida statute provided "justification" for a police officer to use "any force which he reasonably believes to be necessary to defend himself or another from bodily harm while making the arrest or when necessarily committed in retaking felons who have escaped or when necessarily committed in arresting felons fleeing from justice." Fla. Stat.Ann. sec. 776.05 (West 1976). Florida law thus embodied the common-law rule on the use of deadly force. *See Tennessee v.*

*Garner*, 471 U.S. 1, 16 n. 14, 105 S.Ct. 1694, 1703 n. 14, 85 L.Ed.2d 1 (1985) (listing Florida's statute as a codification of the "common-law rule"); *see also City of St. Petersburg v. Reed*, 330 So.2d 256, 257 (Fla.Dist.Ct.App.) (common-law rule in Florida "has ... been codified in Fla.Stat. sec. 776.05"), *cert. denied*, 341 So.2d 292 (Fla.1976). Only recently has Florida amended section 776.05.[3]

By 1978, the City had adopted its own regulations on the use of deadly force. Then-Chief of Police Wilbur Miller had developed a police manual, which in Section 3.43 provided as follows:

Firearms and Weapons:

Authorized Uses: A member shall not draw or display his firearm except for a legal use or official inspection. A Member should never draw his firearm unless he plans to and is ready to use it. When it is necessary to use a firearm, it shall be fired for effect, not to wound or warn. A member may discharge his firearm in connection with the performance of his official police duty, for the following reasons or circumstances.

. . . .

c. To defend himself from death or serious injury.

d. To defend another person, unlawfully attacked, from death or serious injury *when other means have failed.*

e. To apprehend—when all other means have failed—a fleeing felon whom the officer reasonably believes has (1) committed a violent crime to the person of another or (2) a crime

---

**2.** Officer Perez testified that he yelled "halt" two or three times before he shot Brown. Deposition of Luis Perez, at 19–21. Officer Perez also testified that he could not catch Brown, *id.,* and that Brown often would flee the jurisdiction after committing a crime. *Id.* at 7, 31. Brown presented *no* evidence to contradict or question Officer Perez's testimony on these points.

**3.** As amended, section 776.05 provides justification for the use of "any force"

(3) When necessarily committed in arresting felons fleeing from justice and:

(a) The officer reasonably believes that the fleeing felon poses a threat of death or serious physical harm to the officer or others; or

(b) The officer reasonably believes that the fleeing felon has committed a crime involving the infliction or threatened infliction of serious physical harm to another person.

However, this subsection shall not constitute a defense in any civil action for damages brought for the wrongful use of deadly force unless the use of deadly force was necessary to prevent the arrest from being defeated by such flight and, when feasible, some warning had been given.

Ch. 87–147, 1987 Fla.Laws 1123 (effective Oct. 1, 1987).

against property that clearly demonstrates a wanton and reckless disregard for human life.

....

(emphasis in original). The last paragraph of this section stated that a police officer "shall exert no more force than is reasonably necessary to apprehend the fleeing felon, and shall use deadly force only as a *last resort* and only in those instances described under 'Authorized Use' above." (emphasis in original).

Police department policy required that each officer sign a copy of the department's rules, thereby acknowledging that "he had received the manual and agreed to read it and abide by the rules of the manual." Deposition of Chief Wilbur Miller, at 10. Chief Miller repeatedly instructed his officers to read and to comply with the manual. *Id.* at 8, 10, 16, 23, & 36–37. If an officer violated any regulations, the department would check into the matter and, if warranted, suspend or terminate the officer. *Id.* at 35–36.

After the shooting incident in 1979, Brown filed suit against the City. Brown alleged that the City's "policies and procedures" on the use of deadly force deprived him of his constitutional rights, 42 U.S.C. sec. 1983. He also brought pendent state law claims, arguing that the City "negligently and carelessly failed to instruct or supervise" Officer Perez and that the City should be held liable on grounds of negligence and assault and battery. The district court granted the City's summary judgment motion; this appeal followed.

OUR STANDARD OF REVIEW

Preliminarily, we discuss the appropriate standard of review. "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). As the Supreme Court noted in *Anderson,* "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.... If the evidence is merely *colorable,* ... or is *not significantly probative,* ... summary judgment may be granted." *Id.* at 2511 (emphasis added). Put differently, when the defendant moves for summary judgment,

> The mere existence of a *scintilla* of evidence in support of the plaintiff's position will be *insufficient;* there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—"whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed."

*Id.* at 2512 (emphasis added) (quoting *Improvement Co. v. Munson,* 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867 (1872)).

## NO UNCONSTITUTIONAL "POLICY" FOR 42 U.S.C. Sec. 1983

Brown seeks to impose municipal liability on the City of Clewiston for its allegedly unconstitutional "policies and procedures" regarding the use of deadly force. He contends that material fact disputes preclude the grant of summary judgment for the City. After briefly discussing the nature of the constitutional "injury" alleged in this case, we focus on the chief issue before us today—namely, whether Brown's "injury" resulted from an official policy, "statute, ordinance, regulation, custom, or usage" of the City. *See* 42 U.S.C. sec. 1983; *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978).

Brown argues that Officer Perez improperly used deadly force when he shot

Brown, inflicting an "injury" actionable under 42 U.S.C. sec. 1983. His argument depends upon *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), which addressed "the constitutionality of the use of deadly force to prevent the escape of an apparently unarmed suspected felon." *Id.* at 3, 105 S.Ct. at 1697. The *Garner* Court "conclude[d] that such force may not be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Id.* (issue decided in terms of the Fourth Amendment). *See also id.* at 11, 105 S.Ct. at 1701 ("the use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable.").[4]

We assume *arguendo* that Officer Perez shot Brown under circumstances that violated the *Garner* Court's Fourth Amendment standard on the use of deadly force. It is nonetheless axiomatic that "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under sec. 1983 on a *respondeat superior* theory." *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036. To impose liability on the City of Clewiston for the acts of Officer Perez, Brown must show that the City "officially sanctioned or ordered" the shooting. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986); *see also Monell,* 436 U.S. at 691, 98 S.Ct. at 2036 ("custom" must be "so

permanent and well settled" as to have "the force of law.").

Recently, the Supreme Court in *Pembaur* reaffirmed that "tortious conduct, to be the basis for municipal liability under sec. 1983, must be pursuant to a municipality's 'official policy'." *Pembaur,* 106 S.Ct. at 1298. Put differently, "recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Id.* Such "acts" must be "directed" by "the [municipality's] authorized decisionmakers." *Id.* at 1299.[5]

Brown argues that a material fact dispute exists regarding which "policy" the City of Clewiston "officially sanctioned or ordered" at the time of the shooting in 1979. Under the Florida statute, a police officer could use "*any* force which he reasonably believes to be necessary to defend himself or another ... or when necessarily committed in *arresting felons* fleeing from justice." Fla.Stat.Ann. sec. 776.05 (West 1976) (emphasis added). Chief Miller's police manual, on the other hand, more narrowly circumscribed the use of deadly force: the manual authorized the use of deadly force only "as a *last resort*" and "*when other means have failed*" (emphasis in original); it required that the police officer "reasonably believe" that the fleeing felon "has (1) committed a violent crime to the person of another or (2) a crime against property that clearly demonstrates a wanton and reckless disregard for human life." [6]

---

**4.** In *Garner,* a section 1983 suit was filed against several defendants, including a police officer and the City of Memphis, Tennessee. Defendants attempted to "justify" the shooting death of a fifteen-year-old burglary suspect in terms of a Tennessee statute authorizing the use of deadly force. *See Garner,* 471 U.S. at 3–6, 105 S.Ct. at 1697–98. The Supreme Court held that the Tennessee statute could not, as a matter of *constitutional law,* "authorize" the use of deadly force against "unarmed, nondangerous" felony suspects. The statute was "not, however, unconstitutional on its face. Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Garner,* 471 U.S. at 11, 105 S.Ct. at 1701.

**5.** Four Justices in *Pembaur* succinctly stated as follows: "municipal liability under section 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur,* 106 S.Ct. at 1300 (Brennan, White, Marshall, and Blackmun, JJ.).

**6.** In his deposition, Chief Miller testified that he believed the words "reckless and wanton disregard for human life" referred to a crime such as arson. Deposition of Chief Wilbur Miller, at 42.

■ The Record in this case reveals that the official "policy" of the City was contained in Chief Miller's manual. Each police officer was required to sign a copy of the manual to acknowledge that he would adhere to its regulations. Chief Miller verbally instructed his officers to follow the manual and cautioned, "Don't take your gun out unless you need it; don't fire it unless it's absolutely necessary." Deposition of Chief Wilbur Miller, at 23. Nothing in the Record indicates that the City improperly trained its officers on the use of deadly force. *See Brown,* 644 F.Supp. at 1415.[7] Moreover, "the shooting of ... Brown was the only incident of deadly force used by a Clewiston police officer." *Id.* at 1414.

Brown nonetheless argues that "Chief Miller may have promulgated a 'city procedure manual' and then chose, as the official policymaker of the City of Clewiston, to ignore that policy manual and apply [Florida's] Fleeing Felon Statute in situations as they arose with persons such as Plaintiff, Brown." Reply Brief of Appellant, *Brown v. City of Clewiston,* No. 87–5503, at 5. To try to support this theory, Brown has extracted selective statements from the depositions of Chief Miller, Officer Perez, and several expert witnesses, all of whom testified about the City's police manual and the state statute, Fla.Stat.Ann. sec. 776.05 (West 1976). Brown contends that these "statements" cast some doubt upon which "policy" the City was actually following at the time of the shooting incident in 1979.

None of these deposition statements, viewed in context, supports Brown's claim.

In his deposition, Chief Miller stated that he instructed his police officers to follow state statutes and the police manual. Chief Miller recalled that he "wanted" his police officers "to conform with our manual, but above all else to stay within the state statute", Deposition of Chief Wilbur Miller, at 39; he opined that "[a]s far as I'm concerned, Luis Perez abided by the statute at the time, which would supersede my manual...." *Id.* at 92–93.

These statements raise no factual dispute about the City's policy on deadly force. That the Chief wanted his officers "above all else" to violate no state law is not inconsistent with his requirement that they follow the more restrictive City policy.[8] Violation of city policy is bad, but violation of state law—especially in the light of criminal and civil penalties—is worse. In addition, an officer could easily comply with both state law and the city policy manual—although they were not the same—simply by complying with the more restrictive of the two. Similarly, the Chief's assertion that state law justified the shooting of Brown is not inconsistent with the City's policy having been disobeyed. Finally, Chief Miller's statement that state law would supersede his policy manual does not mean that the manual did not contain the City's official policy on the use of deadly force. Actually, Chief Miller was correct to say that the state statute then in effect "superseded" his policy manual in terms of the relevant standard for determining Officer Perez's criminal and civil liability under Florida law. *See Chastain v. Civil Service Board of Orlando,* 327

---

**7.** As the foregoing textual discussion illustrates, Chief Miller instructed his officers to follow the department's manual and to use deadly force only as a last resort. This instruction supplemented training that his officers underwent prior to joining the City's police force. Brown seemingly argues that the City's training and supervisory policies were "inadequate," yet he fails to show how these supposed "inadequacies" rise to the level of an unconstitutional "policy" or "custom" under 42 U.S.C. sec. 1983. We agree with the district court:

> The plaintiff has also failed to establish a custom of improperly training or supervising police personnel. The CITY was very careful of only hiring officers who had completed the

requirements for state certification.... Police Academy instruction regarding the use of deadly force was included.... There is no fact in this record from which a jury could conclude that the CITY maintained a custom of improperly training its officers.

*Brown,* 644 F.Supp. at 1415.

**8.** Chief Miller recognized that his policy manual was "probably more restrictive" than the state statute. Deposition of Chief Wilbur Miller, at 39. Again, when asked "whether there was a violation of your manual or the state statute?", Chief Miller responded, "As far as our manual, too close to call. As far as the state statute, he was well within the statute." *Id.* at 93.

So.2d 230, 232 (Fla.Dist.Ct.App.1976) (distinguishing between legal liability of police officer under state's tort or criminal laws and liability for breach of police department's regulations); *see also City of St. Petersburg v. Reed,* 330 So.2d 256, 257 (Fla.Dist.Ct.App.) (discussed *infra* in text), *cert. denied,* 341 So.2d 292 (Fla.1976).

The deposition statements of Officer Perez[9] and the two expert witnesses[10] likewise provide no indication that a genuine issue of material fact exists to preclude summary judgment for the City. We agree with the district court that, "[t]o the extent that any fact is in dispute, ... that fact (e.g., the existence of an unconstitutional policy) is an *essential element* of plaintiff's claim on which there has been a complete failure of proof after three (3) years of discovery." *Brown,* 644 F.Supp. at 1411–12 (emphasis added).[11]

To the extent that Brown has presented any evidence to establish that what appears to be the City policy is, in fact, not the policy, that evidence is "merely colorable", amounting to at most a "scintilla." No witness testified that the City policy was not, in fact, used. All testimony was consistent with the apparent policy (the police manual) being the true policy.[12] The Record reveals no "significantly probative" evidence that the City's "authorized decisionmakers" officially sanctioned the use

---

**9.** Officer Perez justified his actions in terms of the state statute; he stated that he did not "think" that there were any differences between the state statute and the City's police manual. Deposition of Officer Luis Perez, at 50–51. These statements do not indicate a material fact dispute regarding the City's official policy. Officer Perez did not say that he was instructed to disregard the Chief's manual and to follow some other "policy." In any event, Chief Miller, and not Officer Perez, was responsible for implementing the City's policy on the use of deadly force. *See Pembaur,* 106 S.Ct. at 1298–99 (in determining municipality's "policy", we look to the municipality's "authorized decisionmakers.").

**10.** Brown stresses the deposition statements of two expert witnesses. These witnesses offered their interpretations of the police manual, and they addressed various hypothetical situations. Neither witness said that the manual affirmatively authorized Officer Perez to shoot Brown, assuming that Brown, unarmed, had posed no danger to others. The experts never asserted that the police manual did not contain the City's official policy on the use of deadly force.

**11.** Other than the depositions of Chief Miller and Officer Perez, the Record on Appeal contains the deposition of only *one* other police officer, Raynola Stiles, who was employed by the City at the time of the shooting incident in 1979. Officer Stiles testified about the City's general training and hiring policies. Deposition of Raynola Stiles, at 4–11. She could not recall exactly when Chief Miller's "SOP" ("Standard Operating Procedure" manual) had been implemented. Still, Officer Stiles stated that, "when Wilbur was Chief of Police, any directive that he issued was put in the SOP manuals." *Id.* at 52. This statement simply reinforces our conclusion that, on the basis of the Record before us, the City's official "policy" was contained in the Chief's manual.

**12.** The summary judgment "[s]tandard requires that we resolve all reasonable doubts in favor of the non-moving party, ... but it does not require us to resolve *all* doubts in such a manner." *Barnes v. Southwest Forest Indus., Inc.,* 814 F.2d 607, 609 (11th Cir.1987). *See California Architectural Bldg. Prod. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468–72 (9th Cir.1987) (court carefully analyzed deposition statements and other evidence, and determined that, in context, they showed no fraud to overcome summary judgment); *Gramenos v. Jewel Co., Inc.,* 797 F.2d 432, 436 (7th Cir.1986) (court carefully analyzed "three bits of evidence on which [plaintiff] seizes", found no probative evidence of a conspiracy between police and defendant-store, and concluded that "[a] party cannot defeat summary judgment by pointing to snippets of depositions when the point of *every* witness's statement was that there was no agreement.... Plausible inferences must be resolved in favor of the party opposing summary judgment, but the inferences [plaintiff] presses on us are not plausible."); *Young v. General Foods Corp.,* 840 F.2d 825, 829–30 (11th Cir.1988) (age discrimination case in which we found no "significantly probative" evidence of "discriminatory intent": *"the plaintiff has inferred* that certain facially neutral comments referred to his age in a discriminatory fashion.... The probative value of [the comments] simply is too attenuated to be of legal significance in this case." [emphasis in original]); *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 595–97 (11th Cir.1987) (age and sex discrimination case in which "[plaintiff's] conclusory allegations of discrimination, without more, [were] not sufficient to raise an inference of pretext or intentional discrimination"; "while [a manager's] alleged statement regarding the 'rough characters' the Traffic Manager would have to deal with might be somewhat probative if combined with other more substantial evidence, it is too indefinite to justify by itself an inference of discriminatory intent....").

of deadly force under constitutionally unreasonable circumstances.[13] Because "reasonable jurors could [not] find by a preponderance of the evidence that the plaintiff is entitled to a verdict", *Anderson*, 106 S.Ct. at 2512, there is no basis for municipal liability under section 1983 in this case.

## NO GENUINE ISSUE OF MATERIAL FACT UNDER STATE LAW

Brown also appeals the grant of summary judgment as it pertains to his pendent state law claims against the City of Clewiston. He argues, in effect, that the district court used an improper standard to determine the City's liability under negligence and assault and battery theories.

■ In granting summary judgment against Brown's state law claims, the district court stated that "[t]he standard of care owed by the City to the plaintiff must be determined with reference to Fla.Stat. sec. 776.05 (1979), which governed the use of deadly force by police officers." *Brown*, 644 F.Supp. at 1415, 1416 (same standard applied under negligence and assault and battery theories). This statement derives support from Florida law prevailing at the time of Brown's shooting (in 1979). *See City of St. Petersburg v. Reed*, 330 So.2d 256, 257 (Fla.Dist.Ct.App.) ("when an officer has reasonable grounds to believe one has committed a felony, the officer is entitled to use force which is reasonably necessary to capture him, even to the extent of killing or wounding him."), *cert. denied*, 341 So.2d 292 (Fla.1976); *id.* at 257 (noting that "[t]his rule has ... been codified in Fla.Stat. sec. 776.05."); *see also City of Miami v. Nelson*, 186 So.2d 535, 538–39 (Fla.Dist.Ct.App.) ("Having reasonable grounds to believe [plaintiff] had committed a felony, the officers were entitled to use force which was reasonably necessary to capture him, even to the extent of killing or wounding him."), *cert. denied*, 194 So.2d 621 (Fla.1966); *Gordon v. Alexander*, 198 So.2d 325, 327 (Fla.1967) (endorsing *Nelson:* "We are constrained to hold the officer was justified in his action and did not use unnecessary or excessive force."). Recently, the Florida legislature amended section 776.05 to restrict more narrowly the justifiable use of deadly force,[14] but the amendment applies prospectively[15] and does not affect the instant

13. That Perez, at one point, testified that he "thought" the City policy and state law requirements were the same is not, in and of itself, outcome determinative. If it were enough, there would always be a question of fact as to what a city's policy was if one could show that one employee's "understanding" or "opinion" of the policy was different from someone else's understanding or opinion. "City policy" is more official and formal than that.

As we previously discussed, plaintiff has the burden to show that the municipality's *official policy* or custom caused the tortious injury; "an unjustified shooting by a police officer cannot, without more, be thought to result from official policy." *City of St. Louis v. Praprotnik*, — U.S. —, —, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)). The "official policy" requirement has been succinctly described as follows:

The [Supreme] Court intended there to be a legal perimeter for city liability, which was not to include responsibility for the edicts or acts of its employees, whatever their rank, unless in accord with city policy. Liability must rest on official policy, meaning the city government's policy and not the policy of an individual official. The policy is that of the city, however, where it is made by an official under authority to do so given by the governing authority.

*Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir.1984) (*en banc*). For a recent case in which the plaintiff in a police shooting case did establish an adequate record on city policy or custom, see *Samples v. City of Atlanta*, 846 F.2d 1328 (11th Cir.1988).

14. As amended, the statute determines the relevant standard for the "justifiable" use of deadly force in criminal *and* civil actions against police officers. The amendment took effect on October 1, 1987. *See supra* note 3. No party to this appeal has relied upon the amendment to section 776.05.

15. On its face, the amendment to section 776.05 does not specify whether it applies prospectively or retrospectively. Nonetheless, "[i]t is a well-established rule of construction that in the absence of clear legislative expression to the contrary, a law is presumed to operate prospectively." *Walker & LaBerge, Inc. v. Halligan*, 344 So.2d 239, 241 (Fla.1977). The exception to this "rule" arises only when "the nature of the [new or amended] statute [ ] involved was inherently procedural or affected only the measure of damages for vindication of a substantive right", *id.* at 243, or when the statute "is found to be remedial in nature," and "should be retroac-

action.[16]

■■■■ Brown contends that the Supreme Court's decision in *Garner* somehow "amended" Florida's standard on the use of deadly force. We disagree. *Garner*, which arose from a section 1983 suit against a police officer and a municipality, focused upon the constitutional, Fourth Amendment consequences that result when a police officer uses "deadly force to prevent the escape of an apparently unarmed suspected felon." *Garner*, 105 S.Ct. at 1697. The *Garner* decision did not purport to establish a new standard applicable in state tort law actions. Generally, states may decide what is or is not tortious within their boundaries.[17] Although *Garner* is important in recognizing a federal constitutional tort, nothing in *Garner* made conduct not previously tortious under state law, tortious under state law. *See Mazzilli v. Doud*, 485 So.2d 477 (Fla.Dist.Ct.App.) (citing Fla.Stat.Ann. sec. 776.05 (1979),

tively applied in order to serve its intended purposes." *City of Orlando v. Desjardins*, 493 So.2d 1027, 1028 (Fla.1986). *Cf. Village of El Portal v. City of Miami Shores*, 362 So.2d 275, 278 (Fla.1978) (statute that expressly applied to "pending causes of action" found to be constitutional: the new statute did "not increase the liability of any of the participants in the offense.... The statute simply changes the form of the remedy without impairing substantial rights.").

By amending section 776.05, the Florida legislature effectively abrogated the common-law rule on the use of deadly force. The amendment applies to criminal and civil actions against a police officer. No longer is a police officer "justified" or "entitled" to use deadly force against a fleeing, non-dangerous, felony suspect. Because the legislature made no reference to the retroactive nature of this amendment, we must conclude that the legislature intended the revised statute to apply prospectively: "The presumption is against retroactive application.... The legislature is presumed to be aware of existing law and the judicial construction of former laws on the subjects of its enactments." *Seddon v. Harpster*, 403 So.2d 409, 411 (Fla.1981) (finding "no basis to afford retroactive application" to an amendment redefining "adverse possession" under Florida law). *See also Walker & LaBerge, Inc.*, 344 So.2d at 243 (refusing to apply retroactively an amendment that eliminated "a substantive statutory right (immunity from suit).... Appellants are entitled to rely on this substantive right which vested before the passage of the new statute."); *McPhail v. Jenkins*, 382 So.2d 1329, 1330 (Fla. Dist.Ct.App.) (refusing to apply retroactively an amendment that raised the age of minority for purposes of Florida's wrongful death statute: an earlier Florida Supreme Court decision interpreting the old statute "stands as the applicable judicial interpretation of the legislation controlling at the time the cause of action arose. We are not permitted to give the 1977 amendment ... retroactive application...."), *review denied*, 388 So.2d 1115 (Fla.1980).

16. The amendment to section 776.05 became effective on October 1, 1987. The shooting incident in this case occurred in 1979; Brown filed his complaint in 1983; and the district court granted summary judgment for the City in 1986. Although the amendment was enacted prior to the instant appeal, applying the revised statute to this action would be retroactive in nature and effect: "While as a general rule it is true that disposition of a case on appeal is made in accordance with the law in effect at the time of the appellate court's decision rather than the law in effect at the time the judgment appealed was rendered ..., this rule is *not* applicable when a *substantive* right is altered." *State v. Lavazzoli*, 434 So.2d 321, 323 (Fla.1983) (emphasis added). *Cf. Rothermel v. Florida Parole and Probation Comm'n*, 441 So.2d 663, 665 (Fla.Dist. Ct.App.1983) ("it appears that ... cases pending on appeal and not yet determined are affected by legislative acts which pertain only to remedy or procedure.").

17. In *Ferri v. Ackerman*, 444 U.S. 193, 198, 100 S.Ct. 402, 406, 62 L.Ed.2d 355 (1979), the Supreme Court stated that, "when a state law creates a cause of action, the state is free to define the defenses to that claim, including the defense of immunity, unless, of course, the state rule is in conflict with federal law. U.S. Const., Art. VI, cl. 2." The Supreme Court reemphasized this point in *Martinez v. State of Cal.*, 444 U.S. 277, 282, 100 S.Ct. 553, 557, 62 L.Ed.2d 481 (1980): "even if one characterizes the [state's] immunity defense as a statutory deprivation, it would remain true that the state's interest in fashioning its own rules of tort law is paramount to any discernible federal interest, except perhaps an interest in protecting the individual citizen from state action that is wholly arbitrary or irrational." *See also Kranson v. Valley Crest Nursing Home*, 755 F.2d 46, 52 (3rd Cir.1985) ("Generally speaking, the existence of tort remedies is a matter of state law.... The state is free to create new causes of action and to abolish older ones."); *Cf. Baker v. McCollan*, 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979) ("Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law. Remedy for the latter type of injury must be sought in state court under traditional tort-law principles.")

without mentioning the *Garner* decision), *review denied*, 492 So.2d 1333 (Fla.1986).

Applying the pertinent state tort law standard that prevailed at the time of Brown's shooting, we perceive no basis in the Record to support Brown's negligence and assault and battery claims. As we have already discussed, the City's official policy authorized the use of deadly force only as a "last resort", under life-threatening circumstances. Officer Perez's actions in shooting Brown apparently violated the City's policy. *See Brown*, 644 F.Supp. at 1416. Even under a *respondeat superior* theory,[18] there is no basis to support Brown's tort law action against the City.[19]

In sum, Brown has failed to show that a genuine issue of material fact exists to preclude the grant of summary judgment in the City's favor. Brown must show that some probative evidence supports his state tort law claims. In light of Florida's common-law standard on the use of deadly force, Brown has not met this burden.

As Justice (now Chief Justice) Rehnquist recently stressed, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 106 S.Ct. at 2555 (plurality opinion); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"). Given the cir-

cumstances of this case—namely, a City police manual that narrowly circumscribed the use of deadly force, a police chief who required that his officers follow the manual (*and* that they comply with "state law"), and the single-incident nature of this shooting, we conclude that the record taken as a whole could not lead a rational trier of fact to find that the City had a policy authorizing the use of deadly force when the federal constitution would prohibit such force. No basis exists for liability under Florida tort laws. Accordingly, we AFFIRM the district court.

HATCHETT, Circuit Judge, dissenting:

The majority holds that Brown has failed to demonstrate the existence of a material fact dispute regarding which policy the city of Clewiston followed at the time of the shooting in 1979. Because, in my view, the majority has affirmed the district court's resolution of factual disputes, I dissent.

As noted in the district court's opinion, the plaintiff and the city of Clewiston have stipulated to the following facts:

On June 18, 1979, Officer LUIS PEREZ was a police officer employed by the defendant CITY. PEREZ was within the vicinity of Concordia Avenue in the City of Clewiston and was observing an apartment located at 834 Concordia Avenue. PEREZ was acting within the course and scope of his employment at that time and during the course of subsequent events.

As PEREZ watched, plaintiff BROWN went to the back of the apartment at 834 Concordia Avenue, broke the glass in a

---

**18.** Unlike federal law under 42 U.S.C. sec. 1983, see *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036 ("a municipality cannot be held liable under sec. 1983 on a *respondeat superior* theory."), Florida law allows a plaintiff to recover against a municipality for the tortious acts of its employees based upon *respondeat superior*. *See, e.g., Richardson v. City of Pompano Beach*, 511 So.2d 1121, 1122–23 (Fla.Dist.Ct.App.1987) (interpreting Fla.Stat.Ann. sec. 768.28(9)), *review denied*, 519 So.2d 986 (Fla.1988).

**19.** As we noted *supra* note 2, Officer Perez yelled "halt" two or three times before he shot Brown. Officer Perez testified, without contradiction, that he could not catch Brown, and that

Brown often fled the jurisdiction after committing a crime. Under similar circumstances, the Florida courts have held, as a matter of state law, that a police officer is entitled to use deadly force. *See, e.g., Gordon*, 198 So.2d at 327 ("The officer, having been notified of the breaking and entering, ... was faced with the choice of arresting him or permitting his escape."); *Nelson*, 186 So.2d at 537–38 ("[Plaintiff] proceeded to run and they shot at him, one bullet striking him, preventing further mobility on his part."); *Reed*, 330 So.2d at 257 (following arrest attempt, plaintiff "began to run away, whereupon [Officer] Begerow shot [plaintiff] in the leg.").

window there, and crawled into the apartment. BROWN entered the apartment with the intent to steal a stereo and/or other property. Thereafter, BROWN exited the apartment and returned to a car which was parked nearby. Three (3) of his friends awaited in there.

Officer PEREZ approached the parked vehicle, announced that he was a police officer and told BROWN that he was under arrest. At the time, PEREZ knew who the plaintiff was, knew that he was a juvenile and knew his address. BROWN knew PEREZ was a police officer and that he (PEREZ) was attempting to place the plaintiff under arrest.

After PEREZ told the plaintiff that he was under arrest, BROWN attempted to escape by fleeing. Officer PEREZ discharged his firearm, hitting the plaintiff in the leg, in order to prevent his (BROWN'S) escape....

The following facts, although not stipulated to, are uncontroverted: BROWN committed a felony, to wit: Burglary. BROWN was unarmed at the time he was shot and was not a threat to PEREZ or any other person. Officer PEREZ was not in fear of death or bodily harm at the time he shot BROWN.

*Brown v. City of Clewiston,* 644 F.Supp. 1407, 1409–10 (S.D.Fla.1986).

This appeal comes to us in much the same posture as the Supreme Court's decision in *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). In *Garner,* the father of a 15–year-old burglary suspect who was slain by a police officer, filed suit against the officer, the Memphis Police Department, the city of Memphis, and other public officials, alleging that the shooting violated the fourth, fifth, sixth, eighth, and fourteenth amendments to the United States Constitution. *See Garner,* 471 U.S. at 5, 105 S.Ct. at 1698, 85 L.Ed.2d at 67. Because the facts of *Gar-*

*ner* are so similar to those in this case, a brief review of *Garner* is warranted.

On October 3, 1974, Memphis police officers Elton Hymon and Leslie Wright responded to a late-night call that a burglary was in progress at a private residence. As Officer Hymon approached the house, he observed the suspect, Eugene Garner, run away from the house and across the backyard. With the aid of a flashlight, Officer Hymon was able to see Garner's hands and face, and though not certain, "was 'reasonably sure' and 'figured' that Garner was unarmed." *Garner,* 471 U.S. at 3, 105 S.Ct. at 1697, 85 L.Ed.2d at 5. After Garner refused to obey Officer Hymon's command that he halt, Hymon fired his revolver, fatally wounding Garner. When asked at trial why he fired his revolver, Hymon's only justification was that "there [wa]s no way that I could have caught him." *Garner,* 471 U.S. at 4 n. 3, 105 S.Ct. at 1697 n. 3, 85 L.Ed.2d at 5 n. 3.[1]

In using deadly force to prevent Garner's escape, Officer Hymon was acting pursuant to the authority of a Tennessee statute which provided that "[i]f, after notice of the intention to arrest the defendant, he either flee or forcibly resist, the officer may use all the necessary means to effect the arrest." Tenn.Code Ann. § 40–7–108 (1982). Although the police department's policy was more restrictive than the state statute, it also authorized the use of deadly force in cases of burglary. *Garner,* 471 U.S. at 4–5, 105 S.Ct. at 1698, 85 L.Ed.2d at 5.

Following a bench trial, the district court entered judgment for all defendants, but was subsequently reversed by the court of appeals. *Garner v. Memphis Police Department,* 710 F.2d 240 (6th Cir.1983). On certiorari, the Supreme Court, agreeing with the Sixth Circuit that the Tennessee statute was unconstitutional as applied, held that deadly force may not be employed to prevent the escape of a suspected felon unless the police officer has probable cause

---

**1.** During his deposition testimony, Officer Perez offered a similar justification when asked why he fired his revolver at Brown. Officer Perez testified that as he was pursuing the unarmed Brown, "I was pacing up to him, trying to catch up to him, but at my age, Todd Brown was only about sixteen years old then and I have seen him run. He can run." *See* Deposition of Officer Luis Perez at 20.

to believe that the suspect poses a significant threat of serious harm or death to the officer or others. *Garner,* 471 U.S. at 3, 105 S.Ct. at 1697, 85 L.Ed.2d at 4.

In holding that the Tennessee statute was unconstitutional insofar as it authorized the use of deadly forced against unarmed, nondangerous suspects, the Court underscored the overwhelming trend among the states to abandon the common law rule, which allowed the use of whatever force necessary to prevent the escape of a fleeing felon. *Garner,* 471 U.S. at 25–26, 105 S.Ct. at 1708–09, 85 L.Ed.2d at 18–19. Among those statutes identified by the Court as an embodiment of the common law rule was section 776.05, Florida Statutes, which authorized a police officer to use *"any* force which he reasonably believes to be necessary to defend himself or another ... or when necessarily committed in arresting felons fleeing from justice." Fla.Stat. § 776.05 (emphasis added).[2]

In contrast to section 776.05, the city of Clewiston's police manual was much more restrictive, providing that deadly force could be used by a police officer only:

(1) to defend himself from serious injury;
(2) to defend others from death or serious injury when other means have failed; and (3) to apprehend a fleeing felon when

all other means have failed and where the officer reasonably believes that the felon has committed a violent crime toward a person or a crime against property demonstrating a wanton and reckless disregard for human life.

*Brown,* 644 F.Supp. at 1414.

For purposes of determining whether Brown has stated a claim against the city, I agree with the majority that Brown must allege and submit proof that the city of Clewiston promulgated an unconstitutional policy or custom, which caused the alleged constitutional deprivation. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

In refuting Brown's claim that a material fact dispute exists regarding which policy the city of Clewiston applied at the time of his shooting, the majority concludes that the official policy of the city was contained in Chief Wilbur Miller's police manual. This conclusion is reached because each police officer was required to sign a copy of the manual and because Miller verbally admonished his officers, "Don't take your

---

**2.** The full text of section 776.05 provides as follows:

Law enforcement officers; use of force in making an arrest.—A law enforcement officer, or any person whom he has summoned or directed to assist him, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he reasonably believes to be necessary to defend himself or another from bodily harm while making the arrest or when necessarily committed in retaking felons who have escaped or when necessarily committed in arresting felons fleeing from justice.

As indicated in the majority's opinion, the Florida Legislature has recently amended section 776.05 to more narrowly circumscribe the conditions under which a law enforcement officer may use deadly force to arrest fleeing felons. The amended statute, effective October 1, 1987, provides as follows:

776.05 Law enforcement officers; use of force in making an arrest

A law enforcement officer, or any person whom he has summoned or directed to assist him, need not retreat or desist from efforts to

make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force:

(1) Which he reasonably believes to be necessary to defend himself or another from bodily harm while making the arrest;

(2) When necessarily committed in retaking felons who have escaped; or

(3) When necessarily committed in arresting felons fleeing from justice and:

(a) The officer reasonably believes that the fleeing felon poses a threat of death or serious physical harm to the officer or others; or

(b) The officer reasonably believes that the fleeing felon has committed a crime involving the infliction or threatened infliction of serious physical harm to another person.

However, this subsection shall not constitute a defense in any civil action for damages brought for the wrongful use of deadly force unless the use of deadly force was necessary to prevent the arrest from being defeated by such light, and when feasible, some warning had been given.

Both parties apparently agree that the amendment to section 776.05 has no bearing on the disposition of this appeal.

gun out unless you need it; don't fire it unless it's absolutely necessary."

The majority reasons that Brown attempts to create a material fact dispute regarding the city's official policy by "extract[ing] selective statements from the depositions of Chief Miller [and] Officer Perez...." *Ante* at 1539. To the extent that Brown's argument is predicated on selective portions of the deposition testimony, the majority's analysis is similarly flawed. For instance, conspicuously absent from the majority's opinion is Chief Miller's testimony that he instructed his officers to follow *state law* as well as the department's manual:

> Q. [Counsel for Defendants] Did you keep a tight rein on your officers as far as discharging firearms?
>
> A. [Chief Miller] Well, we had the policies, and I tell them don't be playing cowboys out there, you know. Don't take your gun out unless you need it; don't fire it unless it's absolutely necessary.
>
> Q. And did you tell them to follow the policies in the manual?
>
> A. Follow the policies of the manual AND the STATE STATUTES. [Emphasis added.]

The problem with this response is that the policies embodied in the department's manual and Florida's fleeing felon statute are not coterminous. For example, the police department's manual provides that an officer "shall *not* discharge his firearm to render an arrest or to stop the flight of a person who has committed a misdemeanor or a *felony against property*." Thus, it is indisputable that the department's manual did not authorize Officer Perez to fire his weapon at Brown because as the offense which Brown committed, burglary, is a felony against property.

In contrast, Florida's fleeing felon statute does not differentiate between felonies against property and felonies against the person. Therefore, given Chief Miller's testimony that he admonished his officers "to follow the policies of the manual and the *state statutes*," one could certainly argue that part of the department's "policy"

was that police officers were authorized to use deadly force when attempting to apprehend suspected felons who, as in this case, had committed crimes against property.

This interpretation seems even more plausible given Chief Miller's testimony that he wanted his officers "to conform with their manual but above all else to stay within the state statute." The majority reasons that this testimony raises no factual issue regarding the city's official policy on the use of deadly force because Chief Miller's desire that his officers not violate state law "is not inconsistent with his desire that they adhere to the more restrictive city policy." *Ante* at 1539.

As mentioned previously, however, Florida's fleeing felon statute is much broader regarding the use of deadly force than the department's manual. Chief Miller's instructions that his officers "above all else stay within the state statute" while at the same time "conform with their manual" is an inherent contradiction. As this case demonstrates, although Officer Perez was authorized to shoot Brown under Florida's fleeing felon statute, his conduct necessarily contravened the rules in the department's police manual. Consequently, I am at a loss as to how the majority surmises that Chief Miller's desire that his officers not violate state law "is *not inconsistent* with his desire that they adhere to the more restrictive city policy."

The deposition testimony of Officer Perez likewise raises a genuine issue of material fact as to whether the city's official policy regarding the use of deadly force was embodied in Florida's fleeing felon statute or the department's police manual. For instance, Officer Perez testified as follows during his deposition:

> Q. [Counsel for Plaintiff] Had you ever received any training in the use of deadly force in making an arrest in terms of any state policies or state laws or any county policies—or not county—any city like Clewiston, policies?
>
> A. [Officer Perez] CITY OF CLEWISTON, NO, SIR.
>
> Q. To your knowledge was there any set standard or any lists of standards by

the Clewiston Police Department pertaining to when it used deadly force in making an arrest?

A. Yes, sir.

Q. And were they in any way different from those policies that were used by the state or promulgated from the state of law enforcement?

A. NO, SIR, I DON'T THINK SO.

Q. In your training courses in Fort Myers, did you receive any training when you used a [sic] deadly force in making an arrest?

A. Verbally they would explain to us, yes, sir.

Q. When you were using deadly force, I assume, in the instance of Todd Brown, what was your reason or justification for using deadly force?

A. Fleeing felon.

Q. And was it your understanding that use of deadly force was permitted by the state law and City of Clewiston Police Department's instructions or practice, for instance, in fleeing felons?

MR. PETERSON: Objection to the form.

THE WITNESS: Back there then, that's a State Statute, fleeing felon.

BY MR. NUGENT:

Q. I assume that the State Statute was followed by the Clewiston Police Department?

A. YES, SIR. [Emphasis added.]

Obviously troubled by the equivocal nature of his responses, the majority discounts Officer Perez's testimony by reasoning that he "did not say that he was instructed to disregard the Chief's manual and to follow some other 'policy.'" *Ante* at 1540 n. 9. "In any event," the majority reasons, "Chief Miller, and not Officer Perez, was responsible for implementing the city's policy on the use of deadly force." *Ante* at 1540 n. 9. The majority's reasoning is unpersuasive in at least two respects.

First, it does not save the day for the majority that Officer Perez did not testify that he was instructed to disregard the department's manual and follow some other policy. In Officer Perez's view, the standards for using deadly force contained in the department's manual were identical to the standards contained in Florida's fleeing felon statute.

Second, the majority's rationale that Officer Perez's testimony is irrelevant because Chief Miller was responsible for implementing the city's policy on the use of deadly force, overlooks the fact that the term "policy," as it pertains to municipal liability, is not only a function of rulemaking, but also a function of implementation of those rules. Surely, the city could not escape liability by merely promulgating rules which it never intended to enforce, or of which its employees were never made aware. Thus, while I agree that Officer Perez's testimony is not dispositive, I disagree with the majority's rejection of his testimony as bearing no relevance on the factual dispute regarding the city's policy on the use of deadly force.

Brown has demonstrated the existence of a material factual dispute regarding the city's official policy on the use of deadly force. Factual disputes of this nature are precisely the types of disputes which district courts should refrain from resolving on motions for summary judgment.