Bracie **WATSON**, Jr., Plaintiff,

v.

**UNIVERSITY OF SOUTH ALABAMA COLLEGE OF MEDICINE et al.,**
**Defendants.**

Civ. A. No. 77–550–H.

United States District Court,
S. D. Alabama, S. D.

Jan. 12, 1979.

Carolyn D. Gaines and J. L. Chestnut, Jr., Chestnut, Sanders & Sanders, Selma, Ala., for plaintiff.

Maxey J. Roberts, Mylan R. Engel, Mobile, Ala., for defendants.

HAND, District Judge.

This action was initiated by the filing of a complaint by the plaintiff in the United States District Court for the Middle District of Alabama. On October 4, 1977 the matter was transferred to this Court pursuant to Title 28, U.S.C.A., § 1404(a), since venue properly lies in the Southern District of Alabama.

In his complaint the plaintiff alleges both statutory and constitutional causes of action, citing Title 42, U.S.C.A., §§ 1981 and 1983 and the Fourteenth Amendment to the United States Constitution.

The plaintiff in this action is a black male citizen of the State of Alabama and a former medical student at the University of South Alabama. He sought in his complaint to represent a class composed of all black persons who either in the past, presently, or in the future might be enrolled in the University of South Alabama College of Medicine. The Court, however, dismissed these class allegations after receiving evidence that the purported class was composed of at most seven persons, thus failing to meet the numerosity requirement for class actions set out in Rule 23(a)(1) of the Federal Rules of Civil Procedure. Order of February 8, 1978.

The primary defendant in this lawsuit is the University of South Alabama, at whose medical school the alleged acts of discrimination took place. Other defendants are George C. Wallace, Governor of the State of Alabama and President of the Board of Trustees of the defendant University; Wayne Teague, as Superintendent of Education for the State of Alabama and as a member of the Board of Trustees of the defendant University; J. Mac Bell, Jr., Ernest G. Cleverdon, Charles L. Woods, Ed Dannelly, Gillis Griffin, L. W. Brannan, Jr., Arthur P. Cook, Aubrey D. Green, Mayer Mitchell, Sam Sawyer, Harry Sonneborn and Antoinette Watson, as members of the Board of Trustees of the defendant University; Thomas M. Glenn, Michael J. Kehoe, David G. Laycock, William A. Sorber, Wladimir Wertelecki, Peter J. Dempsey, and Samuel Timothy String, as members of the Promotion and Evaluation Committee of the defendant University's College of Medicine; Frederick P. Whiddon, as President of the defendant University; Robert Kreisberg, as Dean of the defendant University's College of Medicine, and Clyde G. Huggins, as Associate Dean at the College of Medicine.

In the complaint, the plaintiff sets forth three theories of recovery—two federal claims and one state contract claim. The first federal claim charges that the defendants discriminated against the plaintiff as a black student by reason of the fact that the defendants allegedly refused to provide the same degree of academic counseling and assistance to black students as was provided to white students. The second federal claim raises due process questions to the extent that the plaintiff asserts that he was not afforded due process in the procedures leading up to his dismissal as a student from the College of Medicine. The state law claim is for breach of contract, with the plaintiff contending that the College of Medicine's bulletin amounted to a contract and that the school's alleged subsequent departure from the terms of the bulletin amounted to a breach of this contract.

Following an extended discovery period, the matter came on for trial before the Court on the individual claims of the plaintiff. The Court, having considered the record, the exhibits introduced and the testimony adduced at trial, the depositions on file, and the arguments and memoranda of law propounded by counsel for all parties, together with the applicable law, finds as follows:

## FINDINGS OF FACT

1. The plaintiff is a black male who was dismissed from the student body at the University of South Alabama's College of Medicine on July 12, 1976, for academic reasons. Among the defendants are the University itself and the various officers, administrators, and faculty members responsible for College of Medicine policies.

2. The University of South Alabama was established and created under the provisions of Title 52, Section 509(98) et seq. of the Alabama Code of 1940, and it is an agency of the State of Alabama. It is a public body corporate under the name of the University of South Alabama to carry into effect the purposes expressed in the statute, and to establish a state institution of higher learning.

3. Defendants George C. Wallace, Wayne Teague, J. Mac Bell, Jr., Ernest G. Cleverdon, Charles L. Woods, L. W. Brannan, Jr., Arthur P. Cook, Aubrey D. Green, W. M. Collins, Ed Dannelly, Gillis Griffin, Mayer Mitchell, Sam Sawyer, Harry Sonneborn, and Antoinette Watson were members of the Board of Trustees of the University of South Alabama at all times pertinent to the allegations set forth in this lawsuit.

4. The College of Medicine of the University of South Alabama is an integral part of the University of South Alabama and is not a separate legal entity.

5. The plaintiff applied for admission to the University's College of Medicine through the American Medical College Application Service (AMCAS) for the 1975–76 entering class. He received the following scores on his Medical College Aptitude Test (MCAT):

Verbal – 465
Quantitative – 415
General Information – 425
Science – 455

Prior to his application to medical school, the plaintiff had graduated from the University of Alabama in Birmingham and had received his undergraduate degree in Biology.

6. By a letter dated January 15, 1975, the plaintiff was informed by Associate Dean Clyde G. Huggins that his application for admission had been accepted and that he would enter in September of 1975 (Plaintiff's Exhibit 22). On September 8, 1975, the plaintiff commenced his medical education with the class of 1979.

7. During his first year, the plaintiff enrolled in ten separate required courses and received the following grades:

| | |
|---|---|
| Cell Structure & Function | Pass |
| Introduction to Neuroscience | Pass |
| Embryology | Pass |
| Correlation Conference | Pass |
| Public Health | 84 |
| Histology | 70 |
| Gross Anatomy | 64 |
| Biochemistry | 60 |
| Physiology | 59 |
| Neurobiology | 54 |

The top four courses set out above are pass/fail courses in which no specific numerical grades are awarded.

8. In the 1975–76 College of Medicine Bulletin the following classifications are set out to indicate the level of performance of a student as reflected by the grade or evaluation sheet turned in by the coursemaster in each numerically graded course.

| | |
|---|---|
| 93 – 100 | Outstanding |
| 86 – 93 | Above Average |
| 78 – 85 | Average |
| 70 – 77 | Below Average |
| 65 – 69 | Condition |
| Below 65 | Failure |

9. For first year medical students during the 1975–76 school year, as was the plaintiff, an adjusted numerical grade of 65 to 69 was considered to be a conditional grade, and the department head or the coursemaster was to submit a recommendation to the administration setting out what steps ought to be taken to remove the condition. Among the procedures used in the past to eliminate such conditional grades were re-examination, remedial work, or satisfactory performance on a National Board examination.

10. An adjusted numerical grade of less than 65, under the College of Medicine's bulletin, was considered a failure and the coursemaster or department head was required to set forth specific recommendations when the grade was turned in. The College of Medicine requires that a failing grade be made up either through repeat of the course at the University or at another acceptable medical school.

11. The preponderance of the evidence leaves no doubt but that the plaintiff received four failing grades, one below average grade, one average grade, and four passing grades during his stay at the College of Medicine. The evidence further illustrates that the plaintiff did not repeat the courses that he failed either at the University or at any other medical school.

12. The Student Promotion and Evaluations Committee (SPEC) of the College of

Medicine was established to review and evaluate the student academic performance at the end of each academic block for each class of students. Evaluation of student academic progress and performance is also made when the results of the National Board for Medical Examinations are available.

13. SPEC reviewed the total academic record of the plaintiff, as it does with all students who are either failing, conditional, or marginally passing. On June 14, 1976 SPEC, having reviewed the plaintiff's record, recommended that he be dismissed from the College of Medicine. The plaintiff was notified of SPEC's recommendation on June 17, 1976.

14. The plaintiff requested, by letter dated June 19, 1976, an appeal of his dismissal, and he was afforded a hearing before SPEC on July 8, 1976, with regard to this appeal. During the hearing the plaintiff was allowed to appear before SPEC and present his reasons for appeal and his evidence in support of the appeal, he was allowed to call witnesses in his own behalf, and SPEC members were allowed to question the plaintiff (Plaintiff's Exhibit 72).

After the format of the hearing was described to the plaintiff by Dr. Kehoe and the plaintiff's academic history was described by Dr. Huggins, the plaintiff was allowed to present his case to SPEC. The plaintiff gave a lengthy description of the financial problems that had hounded him during his first year of medical school, which he stated led to great mental stress and to limitations on his ability to concentrate on his studies. He pointed out to SPEC that his financial affairs would be in order by the time that the second year commenced, and that he felt he would be able to devote his full energies to his medical studies. During the appeal hearing the plaintiff also pointed to family problems as interfering with his studies.

After discussing his excuses for his poor performance, the plaintiff turned his attention to the counseling that he had received from the various members of the College of Medicine faculty. He admitted to SPEC that the counseling he received from Dr. Huggins, the Associate Dean for Academic Affairs, was appropriate, but he stated that he got the impression from his counseling from other professors that they didn't really want to be bothered with his problems, citing as an example an occasion where he went to a professor's office to discuss a grade and the professor told him that he really should not be discussing that with him. The plaintiff did not get any more specific than this on the counseling question before SPEC.

At the end of his testimony before SPEC the plaintiff requested that he be allowed to repeat the first year of medical school on a probationary status.

There followed a question and answer session in which SPEC members discussed the plaintiff's problems with him. During this session, the plaintiff admitted that he had spoken to or been counseled by various professors of different courses on different occasions during the year in medical school, and he did not describe any inadequacies in the counseling received by him.

Following this session the plaintiff called Bob Russell, a first year medical student, to testify in his own behalf. Russell first read to SPEC a statement signed by Ruth Lyons, another first year student who could not be present, stating that the plaintiff was of good character and was dedicated to the practice of medicine, and requesting that SPEC take this character reference into consideration. After reading this, Russell made his statement to SPEC, reiterating what Lyons had said and stressing the pressures that the plaintiff had suffered under during the school year.

Following Russell's testimony the plaintiff was given an opportunity to expound upon his theory that faculty assistance had been denied him because he was black. One example given by the plaintiff was that when he was among a group of students and asked a faculty member a question, the answer was never directed to the plaintiff. Further, the plaintiff told SPEC that the general feeling among he and other blacks was that they were merely toler-

ated by some faculty members, leading to a lack of communication. Russell (who as far as the Court can discern is white) stated to SPEC that he had not seen any examples of discrimination, but added that he had not been looking for it.

After the close of the hearing SPEC went into executive session and reaffirmed its prior recommendation of dismissal, which was ratified by the Dean on July 12, 1976.

15. The plaintiff's testimony at trial with respect to the counseling afforded him as opposed to other students was very vague. He spoke to only one occasion of alleged discrimination by a faculty member. He had gone to see Dr. Calahan after an examination and Calahan, stating that he was very busy, asked him to come back at a later time. Watson got a later appointment and when he returned there was a white student in Calahan's office and Watson had to wait 45 minutes before he was able to see Calahan. When he finally spoke with him, Calahan was, according to Watson, "indifferent," and he stated that he really shouldn't be discussing the course and Watson's performance therein, although these were allegedly the same things Calahan had discussed with the white student. Watson testified that he complained to Dean Huggins about this, and that Huggins said Watson was nitpicking. Watson also testified that he never saw any other black student accorded similar treatment by Calahan or any other member of the College of Medicine's faculty.

Testimony by Watson on cross-examination revealed that he was informed by both Huggins and Calahan that he was having trouble in his Gross Anatomy course, and both suggested counseling. However, Watson did not go to either of them for such counseling. Watson further revealed that he received counseling in other courses from Doctors Baugh, Mercer, Hair, and Laycock, and that all of the counseling was helpful. In fact, the only professor whose

assistance did not meet Watson's expectations apparently was Dr. Calahan.

16. The plaintiff put on a great deal of evidence relating to the records of other marginal students at the College of Medicine to support his due process contentions.

The evidence revealed that two students, one white and one black, had been allowed to appeal their dismissals to an Ad Hoc Committee appointed by the Dean instead of to SPEC, but this was an experimental procedure and was dropped after the administration concluded that SPEC served better as the appeal hearing body. The Court can find no possible form of discrimination in these facts.

One white student who, like Watson, had four failing grades in his first year was not dismissed but rather was afforded a one year leave of absence with an opportunity to apply for readmission after the leave. The student was under psychological counseling during the school year and has not been readmitted (Plaintiff's Exhibit 78). Another student, of Arab-American ancestry, failed two courses during his first year and received a conditional grade in another course. SPEC considered this student prior to the end of the academic year and recommended dismissal, in which the Dean concurred. However, on appeal SPEC reversed itself and reserved its ruling pending the close of the academic year. At the close of the year the student was allowed to repeat the first year on academic probation (Plaintiff's Exhibit 79). The records of many other students were introduced to reflect the conduct of SPEC in various cases. In most situations SPEC recommended dismissal and affirmed its decision where appealed (Plaintiff's Exhibits 80–81–88–92 & 94). However, just about as often the student appearing before SPEC was placed on academic probation and required to repeat the first year (Plaintiff's Exhibits 89, 91, 93, 85 & 96),[1] the sanctions sought by plaintiff

1. The academic records of those students who were put on academic probation and allowed to repeat the first year differed greatly from the record made by plaintiff Watson. Student "20", whose records comprise plaintiff's exhibit

89, had three conditional grades and no failing grades during the first year. This student repeated the first year and, so far as the Court can tell, remedied the conditional grades and is proceeding toward his degree. Student "21",

Watson for himself. The Court does not find among all the records introduced a student precisely in the plaintiff's circumstances—i. e., having failed four major courses in the first year—who was subsequently allowed to continue his medical education at the College of Medicine.

CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this lawsuit and the parties hereto by virtue of Title 28, U.S.C.A., § 1343, the plaintiff having stated a cause of action under Title 42, U.S.C.A., § 1983.

■ 2. Turning first to the plaintiff's state contract claims, the Court finds the plaintiff's contentions to be completely lacking in merit. Assuming *arguendo* the validity of the plaintiff's position that the Medical College bulletin amounted to a contract between the school and the students, there is absolutely no evidence that any obligation imposed by such a contract was breached by the defendants. The plaintiff contends that he did not fail his first year of medical school because he had an average grade of 65.13 in the courses for which numerical grades were given, and the bulletin states that less than 65 is a failing grade. The Court is of the opinion that this argument is frivolous. The bulletin speaks only to single course grades, and does not stand as a measure by which the average of all such grades is to be compared. The ludicrousness of the plaintiff's position is best exemplified by the situation in which a student might receive a grade of 63 in five courses and a 90 in the other. On this record the student would have failed five of the six courses and yet would have an average grade of 67.5, which would be conditional. This was not the intent of the administration in adopting the scholastic guidelines and the Court is convinced that the language of the bulletin is not so vague as to imply this result.

■ 3. On the plaintiff's first federal claim of discrimination arising from alleged discriminatory treatment by the staff, the Court is of the opinion that the plaintiff has failed to carry his burden of persuasion. The plaintiff singled out one isolated instance of alleged discriminatory treatment that occurred when he went to discuss his performance with a professor. The plaintiff was displeased with the reception he received from the professor and he speculated that it was because of his race. However, there is nothing in the evidence to support the plaintiff's speculation, so the Court must find for the defendants on this point.[2]

■ 4. The plaintiff's final contention is a due process claim by which he contends that his dismissal from the College of Medicine was arbitrary and that the procedure followed in his dismissal was not proper. The simple issue remaining in this case is whether the defendants acted properly and reasonably in dismissing the plaintiff from

whose records comprise plaintiff's exhibit 91, was placed on academic probation after receiving a conditional grade in Anatomy 111 and a failing grade in Anatomy 114. The conditional grade was to be cured by passing a summer make-up exam, while the failing grade was to be removed by successfully passing an authorized course in neuroanatomy as outlined by the Anatomy Department. Student "21" also received a conditional grade in Biochemistry, which was to be cured by repeating the course. So far as Student "21's" records reveal, she is now in the process of repeating her first year of medical school. Students "F", "25", and "16", whose records appear in plaintiff's exhibits 93, 95 and 96, respectively, are similar to the others above. None of these students had as poor an academic record as did plaintiff Watson. Student "93's" record is hardly relevant, since only third year performance is reflected. Student "25", a first year student in 1976–77, had

two failing grades and two conditional passes, while Student "16" received two failing and one conditional grade.

2. This lawsuit is not the first challenge that the plaintiff has made to the allegedly discriminatory policies of the College of Medicine. The plaintiff previously filed a charge of discrimination under Title VI of the Civil Rights Act of 1964 with the Department of Health, Education and Welfare, setting out the same claims advanced in this suit. HEW investigated the charges and found the plaintiff's discrimination charge to be unfounded as there was no indication of preferential treatment toward one race, they found the bulletin vague but not illegal or improper (it appears to the Court that HEW, as did the plaintiff, misunderstood the bulletin), and they found no discrimination in the dismissal of the plaintiff.

the College of Medicine. At the outset, the Court notes that an academic decision of dismissal by the University with respect to its students is not to be interfered with unless there is a clear and convincing showing that such dismissal was violative of some constitutional right of the student, and that the dismissal was arbitrary or capricious. *Board of Curators of the University of Missouri v. Horowitz,* 435 U.S. 78, 91, 98 S.Ct. 948, 956, 55 L.Ed.2d 124, 136 (1978).

■ The plaintiff first asserts that he was not afforded procedural due process since in the appeal process the same committee that initially considered his academic record and recommended dismissal was allowed to serve as the appeal body. The Court cannot agree. The Court initially questions whether such a hearing was actually required in light of the language in *Horowitz, supra,* 435 at 87, 98 S.Ct. at 953, 54 L.Ed.2d at 133–34, that hearings need not be held in the case of a dismissal for academic reasons. However, assuming that the plaintiff was entitled to such a hearing, the Court is convinced that the hearing received was adequate from a procedural due process standpoint since the plaintiff was provided with notice of SPEC's recommendation of dismissal and was given an opportunity to be heard on the question. *See Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). The Court is of the opinion that the evidence is conclusive that the plaintiff was afforded a full and fair hearing after notice and was thus accorded procedural due process in this matter.

■ The plaintiff also makes a substantive due process argument contending that SPEC acted arbitrarily and capriciously in deciding to dismiss him, based on the record of SPEC with respect to other students. The Court cannot agree with this contention either. While the evidence reflects that different students were treated differently and accorded individual treatment, this is to be expected by a committee considering the entire academic record of many different students. This Court would only be persuaded by the plaintiff's arguments on this point where there was evidence that a student with an academic record and an individual history very similar to the plaintiff's was afforded substantially different treatment from that received by the plaintiff. There is no evidence indicating that this ever happened,[3] so the Court must find for the defendants on this point also.

---

**3.** The plaintiff contends that the situation surrounding Student "13", a white student whose records comprise plaintiff's exhibit 78, is sufficiently analogous to warrant a finding of arbitrariness. This student had failing grades in four courses and was conditional in two others; thus his grades were even lower than the plaintiff's. Yet "13" was not dismissed but rather was granted a leave of absence to apply for readmission one year later. However, the case of Student "13", while analogous in some respects to that of the plaintiff, is distinguishable in the one important respect that Student "13" was undergoing therapy for psychological problems during his first year of school. The leave was granted so that such therapy could be continued for a year and the student was not guaranteed readmission. The Court noted also that the SPEC decision concerning Student "13" came two years after the Watson decision. None of the other students whose records were introduced into evidence had an academic record sufficiently similar to that of the plaintiff to even merit comparison. The Court does note that Student "A" (Plaintiff's exhibit 83), who matriculated with Watson in the 1975–76 entering class, had a better academic record than Watson and yet was also dismissed.