[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-14882
_____

D.C. Docket No. 2:12-cv-02458-AKK

DOUGLAS LEE ROLLINS, III,

Plaintiff-Appellant,

versus

THE BOARD OF TRUSTEES OF
THE UNIVERSITY OF ALABAMA &
MICHAEL S. REDDY, DMD, Dean of
the School of Dentistry, in his official and
individual capacities,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(April 11, 2016)

Before ED CARNES, Chief Judge, JILL PRYOR, Circuit Judge, and REEVES,*
District Judge.

_____

* Honorable Danny C. Reeves, United States District Judge for the Eastern District of Kentucky,
sitting by designation.

REEVES, District Judge:

Appellant Douglas Lee Rollins was dismissed from the University of Alabama at Birmingham's School of Dentistry for poor academic performance after completing two semesters. Rollins, a white male, brought suit against the university's Board of Trustees alleging race and gender discrimination. He also sought declaratory and injunctive relief against the Board of Trustees and the School of Dentistry's Dean, Dr. Michael S. Reddy. Rollins now appeals the district court's order denying his motion for summary judgment and granting summary judgment for the defendants. We affirm the district court's decision.

## I.

In July of 2011, Rollins began classes at the University of Alabama at Birmingham's (UAB) School of Dentistry. Rollins failed a three-hour course in Dental Anesthesia during his second semester. Under the dental school's official academic guidelines, "[a]ny failing course grade must be remediated." On June 4, 2012, Rollins met with Dr. Patrick Louis, the Dental Anesthesia course director, to discuss the possibility of either raising his grade or remediating the course. Dr. Louis advised Rollins that the school's Academic Performance Committee ("APC") would determine whether he was eligible for remediation. Dr. Louis also suggested that Rollins might be required to submit an essay on an area that he

2

struggled to grasp during the class.  A week later, Rollins submitted a research paper entitled "Clinical Complications of Dental Anesthesia."

On June 20, 2012, the APC met to discuss the School of Dentistry students' 2012 grades.  Under the academic guidelines, the APC could recommend that a student repeat a year of course work or be dismissed from the dental school for "any failing grade" or "continued poor/marginal academic performance."  Before the June 20th meeting, Dr. Kenneth Tilashalski, the School of Dentistry's Associate Dean, sent information to APC members regarding the academic performance of students who would come before the group for review.  Rollins takes issue with Dr. Tilashalski's representations to the committee members in an e-mail dated June 8, 2012.  Dr. Tilashalski prefaced the e-mail by explaining that the information was incomplete "as grades [were] not due until next Friday." Regarding Rollins, Dr. Tilashalski wrote:

- Failed Dental Anesthesia.  I cannot recall the last time that a student has failed this course (if ever). . . .
- Failed Gross Anatomy with a 53.3% average but successfully passed the retest.  The course syllabus in Gross Anatomy indicates that a retest will only be offered to students that have final course grades between 60-69%.  I have emailed the course director for clarification of why Lee was even offered the retest – it seems like he should have failed Gross Anatomy as well.
- After the fall term (and prior to the failure of [Cardiovascular-Renal]), Lee was 51/56 students.
- He has received multiple marginal [grades] (lots of "C" grades) with the grades reported so far for the spring 2012 term.

3

- Failed individual exams in Fundamentals.  This is particular[ly] troublesome.  Lee was allowed to take the Fundamentals courses as an Oral Biology student (he was in the Oral Biology program prior to getting into dental school – he did not receive his masters degree due to GPA below 3.0).  He received "C" grades in both Fundamental courses as an Oral Biology master student.  So this was the 2nd time he took the Fundamentals courses and he still was not able to pass all of the exams, . . . although he was able to pull his grades up and ultimately received "B" grades for Fundamentals I & II.

Dr. Tilashalski received an e-mail on the same date from Dr. Steven Zehren, the course director for Gross Anatomy, regarding the retest.  The course syllabus provided that, "[s]tudents who earn a grade of 60-69 in the course will be allowed to take a competency exam. . . .  If a student receives a grade of 70 or higher on the competency exam, he/she will then receive the lowest possible passing grade for the course (ie, 70=C)."  Dr. Zehren explained in his e-mail that, in 2009, he allowed seven students who fell below the sixty percent cut-off to take the retest.  In 2012, Rollins completed the course with a fifty-three percent average, the only student with a grade below a sixty percent.  According to Dr. Zehren, Rollins was allowed to retest based on the 2009 precedent and because there would be little to no opportunity for him to make-up the class.  After receiving Dr. Zehren's e-mail, Dr. Tilashalski promptly forwarded it to the APC committee members.

During the June 20th meeting, the APC held an open discussion regarding the students under review.  Thereafter, the APC voted to dismiss Rollins and an

4

African-American female student from the same class. The APC also voted to allow a white female student to repeat her first year of dental school. Comparator One (the African-American female who was dismissed by the APC) ranked last in her class at the end of the spring semester. During that semester, she received scores of one B, six Cs, and one pass. The student also received a score of F in a six-hour course (Cardiovascular-Renal), resulting in a 1.95 grade point average ("GPA") for the semester and a cumulative GPA of 2.38.

Comparator Two (the white female who was allowed to repeat the year) ranked second to last in her class. This student also failed Cardiovascular-Renal in her second semester while receiving scores of three Bs, four Cs, and one pass, resulting in a semester GPA of 2.10 and a cumulative GPA of 2.55. Comparators One and Two were allowed to take the comprehensive retest offered in Cardiovascular-Renal; however, both failed the retest.

During his first semester, Rollins received scores of two As, seven Bs, and two passes, resulting in a 3.17 GPA. He ranked fifty-first out of the fifty-six first year dental students that semester. At the end of the second semester, Rollins received scores of four Bs, three Cs, one F, and one pass, resulting in a 2.34 GPA for the semester and a 2.72 cumulative GPA. At the end of the second semester, Rollins ranked third to last in his class.

5

Dr. Tilashalski informed Rollins by letter dated June 21, 2012, that the APC had voted to dismiss him from the dental school.  Dr. Tilashalski also met with Rollins prior to the APC's meeting and explained the appeals process.  The dental school's academic guidelines provide for two types of appeals: a grade appeal and an academic status appeal.  For a grade appeal, the guidelines require that the student first seek clarification from the course director.  If discussions with the course director did not resolve the appeal, the student was required to submit a written appeal to the chair of the department in which the contested grade was given.  If the chair of the department did not grant the appeal, the student could appeal to the Associate Dean.

On June 26, 2012, Rollins notified Dr. Louis that he was appealing his grade in Dental Anesthesia.  Rollins claimed in his notice that Dr. Louis' grading was inconsistent and arbitrary.  He also attached his "Clinical Complications of Dental Anesthesia" paper.  Rollins made the same claim in an e-mail to Dr. Peter Waite, the chair of Dr. Louis' department.  Four days later, Dr. Louis denied Rollins' appeal and his request to remediate.  Dr. Waite also advised Rollins that same day that he was denying his grade appeal.  Rollins did not appeal his failing grade in Dental Anesthesia to Dr. Tilashalski (*i.e.*, the last step of the grade appeal process under the academic guidelines).

6

Under the academic guidelines, a student may contest dismissal from the dental school by sending a written academic status appeal to the Chair of the Faculty Council.  The Faculty Council must then conduct a hearing following certain procedures set forth in the guidelines.  As required by the guidelines, Rollins sent a written appeal of his dismissal to Dr. John Ruby, Chair of the Faculty Council.  The council then held a hearing during which Dr. Tilashalski presented the APC's reasons for dismissing Rollins and Comparator One and for requiring Comparator Two to repeat her first year of dental school.

Several council members contributed to the APC's list of reasons for dismissing Rollins during the discussion that followed.  Dr. Ruby told the committee that Rollins and Comparator One, but not Comparator Two, failed an open-book essay exam in his Cariology class.  According to Dr. Louis, even though he curved the grades in Dental Anesthesia, Rollins "still didn't meet the criteria."  In fact, "he wasn't even on the borderline."  Dr. Louis added that Rollins acted dishonestly by stating that he requested the paper as remediation.  Next, Dr. Tilashalski reminded the council members that Rollins failed all of the assessments given in Gross Anatomy and that he only passed the course because of the retest.  Dr. Tilashalski summarized his position by stating that, "[Rollins] failed dental anesthesia, should have failed gross anatomy, and . . . performed poorly on a course he already had the previous year."

7

The Faculty Council also discussed its concerns with Rollins' academic integrity. Drs. Waite and Tilashalski contended that another person likely wrote Rollins' academic appeal. Dr. Tilashalski also advised the council that he had analyzed Rollins' paper for Dr. Louis using plagiarism detection software. According to Dr. Tilashalski, his analysis indicated that Rollins had copied large portions of the paper from sources cited in his bibliography.

Toward the end of their discussion, the council heard individual testimony from Comparator One, Comparator Two, and Rollins. Further, each individual called supporting witnesses. After the students presented their cases and were excused from the meeting, council members expressed their opinions regarding each student. Ultimately, the Faculty Council voted unanimously by secret ballot to uphold the APC's decision to dismiss Rollins and Comparator One but to allow Comparator Two to repeat her first year of dental school.

## II.

On July 11, 2012, Rollins filed this action against UAB's Board of Trustees and Dean Reddy in Alabama's Jefferson Circuit Court. Rollins' original Complaint sought declaratory and injunctive relief allowing him to either repeat his first year of dental school or remediate Dental Anesthesia and start his second year of dental school. Rollins also requested damages from the Board of Trustees for sex-based discrimination in violation of Title IX of the Education Amendments of

8

1972, 20 U.S.C. § 1681, *et seq*.  After the defendants removed the case to the United States District Court for the Northern District of Alabama, Rollins amended his Complaint to include claims for race-based discrimination in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq*.

Nearly three months after the discovery deadline, Rollins filed a motion captioned "Plaintiff's Motion in the Spirit of Rule 56(d)" in which he argued that the court should compel the defendants to produce all the Dental Anesthesia exams from the spring of 2012.  According to Rollins, Rule 56(d) of the Federal Rules of Civil Procedure justified a discovery extension where he was unable to "present facts essential to justify [his] opposition" without the exams.  After the parties moved for summary judgment, Rollins again sought to compel the production of exams or to reopen discovery for the same reasons set forth in his Rule 56(d) motion.

On September 29, 2014, the district court granted the defendants' motions for summary judgment, denied Rollins' Rule 56(d) motion, and denied Rollins' motion for summary judgment.  Rollins challenges the district court's summary judgment decision on appeal.

### III.

A district court's decision on a motion for summary judgment is subject to *de novo* review.  *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000).

9

To obtain summary judgment, a movant must demonstrate that there are no genuine issues of material fact in dispute and that he or she is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  This standard requires that the reviewing court view all the facts and draw all inferences from the evidence in a light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  However, summary judgment is not appropriate where the movant's evidence "is merely colorable" or "is not significantly probative." *Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986) (emphasis omitted)).  Rather, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## IV.

Rollins argues that the district court should not have granted summary judgment in the defendants' favor regarding his due process claim.  In evaluating this claim, the Court notes that a student dismissed from a public educational institution for academic reasons is entitled to less process than a student dismissed

for disciplinary reasons.[1]  *Haberle v. Univ. of Ala.*, 803 F.2d 1536, 1539 (11th Cir. 1986).  In fact, the Constitution does not require schools to hold formal hearings for academic dismissals.  *Id; see also Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90, 98 S. Ct. 948, 955, 55 L. Ed. 2d 124 (1978).  Procedurally, however, a school is required to engage in a "careful and deliberate" decision-making process.  *Haberle*, 803 F.2d at 1539 (quoting *Horowitz*, 435 U.S. at 85).  As the Supreme Court explained in *Horowitz*, 435 U.S. at 91, "[b]y and large, public education in our Nation is committed to the control of state and local authorities."  (internal citation and quotation marks omitted)  Courts are reticent to intrude on that historic control.  *Id.*

For substantive due process claims, courts extend similar deference to a school's academic decisions.  In *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 225, 106 S. Ct. 507, 513, 88 L. Ed. 2d 523 (1985), the Supreme Court held that a medical student's substantive due process rights were not violated where "the faculty's decision [to dismiss him] was made conscientiously and with

---

[1]    The Supreme Court has not addressed whether students have a constitutionally-protected liberty or property interest in continued enrollment at public educational institutions.  But the Court presumed the existence of such a right in *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 84–85, 98 S. Ct. 948, 952, 55 L. Ed. 2d 124 (1978).  In *Barnes v. Zaccari*, 669 F.3d 1295, 1304–05 (11th Cir. 2012), this Court held that a student at a publicly-funded college had procedural due process rights based on the board of regents' policy manual and the school's code of conduct.  Rollins has not specifically addressed this issue.  However, the appellees have not asserted that Rollins does not possess some due process rights.  Like in *Horowitz*, this Court will assume such rights exist.

11

careful deliberation, based on an evaluation of the entirety of Ewing's academic career."[2]  It explained that,

> [w]hen judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment.  Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

*Id.*

On appeal, Rollins conflates the substantive and procedural due process standards.  He frequently alleges a "substantial departure from accepted academic norms," an element of substantive due process, when discussing arguments he labeled as procedural issues at the district court level.  Nevertheless, application of either standard – substantive or procedural – leads to the same result.  The district court correctly concluded that summary judgment was appropriate because the record establishes that UAB officials acted carefully and deliberately in dismissing Rollins from dental school.

### A.    Dr. Tilashalski's Representations to the APC and Faculty Council

Rollins alleges that Dr. Tilashalski made false statements and provided misinformation to the APC and the Faculty Council and that Dr. Tilashalski's

---

[2]    Relying on *Horowitz*, 435 U.S. at 91-92, the *Ewing* Court also assumed a constitutionally-protected property right.  474 U.S. at 222-23.

12

actions resulted in a violation of his due process rights.  Rollins further contends

that the district court acted improperly in overlooking or excusing this conduct.

### 1.    Cardiovascular-Renal Grade

Dr. Tilashalski admits that the June 8, 2012, e-mail he sent to the APC

incorrectly stated that Rollins failed the Cardiovascular-Renal course.  However,

the district court observed that the same e-mail contained a spreadsheet with the

correct grade and that the minutes from the APC meeting[3] accurately represented

Rollins' Cardiovascular-Renal grade.  Because "the APC reached a decision based

on the correct information," the district court concluded that Dr. Tilashalski's

mistake did not violate Rollins' due process rights.

Rollins argues that the district court should have allowed a jury to decide

whether the APC's receipt of the correct information cured Dr. Tilashalski's

prejudicial statement.  However, he fails to cite any authority for this contention,

and he ignores the actual due process requirements for academic decisions.  In both

*Horowitz* and *Ewing*, the Supreme Court held that lower courts are required to give

deference to the professional judgment of educators in making academic decisions.

---

[3]    Rollins also takes issue with the district court's reliance on the minutes from the APC
meeting.  In support of his contention that the minutes are "bogus," Rollins states that they are
actually notes taken by Dr. Tilashalski that the APC never approved.  He concludes that the notes
*might* contain inaccuracies because of their source.  There is no evidence, however, that the
minutes contain inaccuracies.  The district court did not err by relying on a document, the
contents of which are not genuinely disputed.

13

Rollins does not dispute that the members of the APC received the correct information before they voted to dismiss him from the dental school. The district court rightly presumed that academic professionals are capable of disregarding preliminary misinformation and then making a careful and deliberate decision based on correct information. Further, the record does not contain any proof that any APC members voted to dismiss Rollins because they believed he failed Cardiovascular-Renal.

### 2.    Gross Anatomy Grade

Rollins also asserts that Dr. Tilashalski misrepresented to the APC and the Faculty Council that he failed Gross Anatomy. He contends that he did not fail the course because he passed the comprehensive retest. However, Rollins does not dispute that he failed every other assessment in Gross Anatomy or that his final grade before the retest was fifty-three percent. Nor does Rollins dispute that the syllabus provides that, "[s]tudents who earn a grade of 60-69 in the course will be allowed to take a competency exam." But, according to Rollins, this portion of the syllabus does not expressly bar students who earn under a sixty percent grade from taking the retest. Thus, he claims that the district court erred in finding that the

14

syllabus *only* allowed students with a course average of sixty to sixty-nine percent to retest.[4]

Rollins' strained reading of the syllabus does not create a genuine dispute of material fact. The district court reasonably attributed meaning to the sixty to sixty-nine percent passage in the Gross Anatomy syllabus. If any student who received less than a sixty percent was eligible to retest, the sentence would be entirely superfluous. Further, the record plainly shows that Dr. Tilashalski forwarded Dr. Zehren's e-mail regarding the 2009 precedent to the APC as soon as he received it. The district court found that Dr. Zehren's e-mail was also printed and provided to the Faculty Council.

Rollins counters that the transcript does not indicate that the issue was discussed at the Faculty Council meeting. Nevertheless, the record establishes that the Faculty Council members were aware of the precedent.

Notwithstanding the precedent, Dr. Tilashalski believed that Rollins should not have received a passing grade in a foundational science class when his course average was a fifty-three percent. Neither the academic guidelines nor the due process requirements prohibited Dr. Tilashalski, a professional educator, from

---

[4] Because Dr. Zehren allowed students who fell below the sixty percent cut-off to take the retest in 2009, Rollins alternatively argues that he was *entitled* to take the retest. Further, he claims his due process rights were violated when Dr. Tilashalski failed to orally inform the Faculty Council about the 2009 precedent.

15

sharing his opinion with other educators who possessed the same objective information. While the Faculty Council and the APC possessed all the information Rollins claims was necessary and were free to make their own determinations, both determined that Rollins' academic performance merited dismissal.

### 3.     Failing Grades in Dental Anesthesia

Rollins asserts that Dr. Tilashalski also misinformed the Faculty Council that he received the only failing grade in the spring Dental Anesthesia course. Even assuming that such a mistake would affect Rollins' due process rights, the record does not support this argument.

Comparator Two received the second lowest grade in Dental Anesthesia. However, she still received a score of 69.83 percent. Because Dr. Louis rounded any grade between 69.1 and seventy percent to a C-grade, Comparator Two finished the class with a C. In the district court, Rollins argued that there are six different figures, ranging from 67.24 to sixty-eight, that purport to reflect his final grade in Dental Anesthesia. But as the district court observed, Rollins fell below a score of 69.1 percent, and, therefore, he failed the class regardless of which figure the Court uses. Thus, Dr. Tilashalski accurately informed the Faculty Council that Rollins was the only student to fail Dental Anesthesia.[5]

---

[5]     Rollins also challenges Dr. Tilashalski's statements to the APC and Faculty Council that he could not remember the last time someone failed Dental Anesthesia. Rollins asserts that

16

## B.    Remediation

Next, Rollins maintains that the dental school violated his due process rights by denying his request to remediate his failing grade in Dental Anesthesia. Rollins disagrees with the district court's conclusion that the APC and the Associate Dean determine whether a student may remediate a class. Regardless of the academic guidelines' actual language, Rollins argues that, in practice, individual course instructors decide who may remediate a course. For support, he relies on the deposition testimony of Dr. Paul Eleazar, who stated that he would occasionally allow remediation without the APC's approval. Rollins cites to Dr. Louis' e-mail denying his grade appeal and request for remediation. Yet, Rollins fails to explain how any of these arguments advance his due process theory. Regardless of whether the APC, the Associate Dean, or Dr. Louis was responsible for the remediation decision, there is no dispute that each would have denied Rollins the opportunity to remediate.[6]

---

numerous people failed the class. However, Dr. Tilashalski's statements regarding his memory of events are not refuted by the record.

[6]    Dr. Louis' e-mail to Rollins is not inconsistent with his earlier stance on remediation that the district court discussed in its opinion. Dr. Louis told Rollins prior to the June 30th e-mail that Rollins would need approval from the APC for remediation. Dr. Louis' refusal to grant Rollins' request for remediation did not undermine his position that remediation was in the APC's discretion.

17

Rollins also contends that the APC did not recommend remediation because no one presented that option to the committee. The academic guidelines state in the first paragraph that, "the APC will make recommendations to the Associate Dean regarding promotion, probationary status, repetition, remediation, and dismissal." Dr. Tilashalski observed that, "all three options were available[:] remediation, repetition, or dismissal." However, the guidelines do not require the Associate Dean or any member of the APC to offer remediation as an option at a committee meeting before voting on a student's academic status. Again, all of the APC members had the information Rollins insists was necessary. Yet, after discussion of his academic performance, they deliberately decided to dismiss him. This option was specifically permitted by the guidelines.

Over a ten-year period, Rollins identified fifty dental school students who received a failing grade but were permitted to remediate. Based on this information, Rollins argues that the School of Dentistry's decision to deny him remediation was a "substantial departure from accepted academic norms." The district court rejected this argument because Rollins did not prove that he was similarly-situated to any of those fifty students.

The federal district court for the Southern District of Alabama considered a similar issue in *Watson v. University of South Alabama College of Medicine*, 463

18

F. Supp. 720 (S.D. Ala. 1979).  In deciding whether a student's dismissal from medical school violated his substantive due process rights, the court held that,

> [w]hile the evidence reflects that different students were treated differently and accorded individual treatment, this is to be expected by a committee considering the entire academic record of many different students.  This Court would only be persuaded by the plaintiff's arguments on this point where there was evidence that a student with an academic record and an individual history very similar to the plaintiff's was afforded substantially different treatment from that received by the plaintiff.

*Id.* at 727.  Here, the district court specifically considered whether those students who also failed Dental Anesthesia in past semesters were similarly-situated to Rollins.  The court held that they were not, because all but one of them had finished their first year of dental school when they took the course.  Therefore, unlike Rollins, they had already proven that they possessed the aptitude to succeed in dental school.  The only other student who failed first-year Dental Anesthesia withdrew from the program, eliminating the remediation issue altogether.

In *Ewing*, 474 U.S. at 219, the Supreme Court similarly concluded that the appellee was not entitled to retake a medical board exam even though he was the only student who, having failed the test, was not permitted to retake it.  The Court observed that the school's decision was sufficiently careful and deliberate, notwithstanding proof that certain students were allowed to retake the exam as

19

many as three or four times.[7]  *Id.* at 219, 227.  Here, Rollins did not present a single comparator with a sufficiently similar academic record who was also denied remediation.  Accordingly, he is not entitled to relief based on his remediation argument.

### C.    The Faculty Council's Discussion of Rollins' Potential Ethics Violations

Rollins also challenges the Faculty Council's discussion of his research paper and academic status appeal.  He argues that the council should have referred its plagiarism concerns to the school's ethics council.  Rollins relies on the testimony of Dr. Ruby in support of this assertion.

Dr. Ruby agreed in his deposition testimony that the ethics council is the appropriate forum for plagiarism allegations.  However, Dr. Ruby also indicated that Rollins' research paper was unique in that it was unsolicited.  Neither the Faculty Council nor Dr. Louis asked Rollins to submit the paper.  Instead, he chose

---

[7]    During oral argument, the plaintiff cited to *Maitland v. Wayne State University Medical School*, 257 N.W.2d 195 (Mich. Ct. App. 1977), as a favorable case with similar facts.  In *Maitland*, the Michigan appellate court upheld the trial court's decision to reinstate a student dismissed from medical school for failing an exam.  Notably, *Maitland* was decided before the Supreme Court's decisions in *Ewing* and *Horowitz*.  Further, *Maitland* is factually distinct from this case.  The *Maitland* Court found it significant that several students who scored lower than the plaintiff on the same test were allowed to retake the exam.  *Id.* at 200.  Rollins, on the other hand, has not produced evidence that any student scored lower than him in Gross Anatomy or Dental Anesthesia.  Additionally, he has not identified any evidence that any student who was similarly-situated received different treatment.

to write the paper and submit it to the council.  Nothing in the academic guidelines prohibits the Faculty Council from considering the actual source of material voluntarily submitted by a student for its review.  And contrary to Rollins' assertions, the guidelines also do not forbid the council from reviewing materials that the APC did not consider.  As the district court properly observed, the guidelines merely indicate that, "at a minimum," the council should review the same materials that the APC reviewed.

Rollins further contends that the district court drew "impermissible inference[s]" when it refused "to question Tilashalski's and Waite's professional evaluation" of his academic status appeal and research paper.  However, a district court does not err as Rollins suggests by deferring to the professional judgment of education officials.  In fact, the Supreme Court has directed courts to do just that when reviewing such matters.  *See Ewing*, 474 U.S. at 225.  In part, this is because, "[c]ourts are particularly ill-equipped to evaluate academic performance." *Horowitz*, 435 U.S. at 92.  On the other hand, Drs. Tilashalski and Waite, as experienced educators, were fully capable of determining whether the materials submitted by Rollins were authentic.  Rollins' due process rights were not violated when these educators voiced their opinions at a meeting of other professional educators who were capable of reaching their own independent conclusions.

21

During the council's meeting, Dr. Tilashalski also suggested to others that, "maybe we should say we told him [to write the paper] and fail him on the remediation." According to Rollins, this comment demonstrates bias and bad faith. But, contrary to this argument, the evidence supports the district court's conclusion that: (i) the Faculty Council rejected Dr. Tilashalski's suggestion, (ii) Dr. Tilashalski did not have a vote on the council, and (iii) Dr. Waite's opinion gave the council an independent basis to assess Rollins' research paper.

Rollins counters that the district court's conclusions amount to an improper credibility determination. He further asserts that Dr. Tilashalski was "like a DA running the grand jury." However, Rollins' argument undervalues the judgment of professional educators who had access to the same information as Dr. Tilashalski. After Dr. Tilashalski's presentation, he left the meeting, and the council held its own independent discussion. The council then voted to affirm the APC's dismissal of Rollins, rather than implement Dr. Tilashalski's proposal.

**D.    Consideration of Pre-Dental School Grades**

Rollins claims that the Faculty Council improperly considered his pre-dental school grades in dismissing him from the dental school. The district court rejected this argument because the guidelines require the council to review the APC's decision which necessitates a review of the materials considered by the APC.

22

Thus, the council was obligated to consider Rollins' pre-dental school grades because the APC considered them.

On appeal, Rollins argues that the district court's holding "misses the point." He contends that the council "substantially depart[ed] from accepted norms" when it failed to consider the pre-dental school grades of Comparators One and Two. But Rollins offers no proof that Comparators One and Two were similarly-situated in terms of their pre-dental school grades. The record does not contain any evidence that, like Rollins, Comparator One or Two failed similar classes prior to their arrival at dental school. In short, Rollins has not pointed to evidence in the record that the pre-dental school grades of either comparator merited consideration by the APC or Faculty Council.

## E.    Dr. Louis' Grading

Rollins also accuses Dr. Louis of lying to the Faculty Council about curving Dental Anesthesia grades. However, Dr. Louis confirmed during his deposition that he rounds scores as low as 69.1 percent to C-grades. The fact that Comparator Two passed Dr. Louis' class with an average score of 69.83 supports the conclusion that Dr. Louis applied his rounding policy to grades for the spring of 2012. However, Dr. Louis did not *scale* the grades in 2012. And because he did scale the grades in 2011, Rollins claims that the different treatment qualifies as "a substantial departure from accepted norms."

23

Dr. Louis' deposition testimony demonstrates that he treated the 2011 and 2012 grades differently because the two classes were not similarly-situated. Dr. Louis explained that, in 2011, few students attained A-grades. But, after performing a psychometric analysis, he determined that the exam was difficult for the class as a whole. As a result, Dr. Louis decided to scale the grades. In 2012, Dental Anesthesia students performed much better than students enrolled in the class in 2011. Accordingly, he determined that "additional scaling was not warranted." In other words, Dr. Louis did not scale the 2012 grades because Rollins was an outlier. Instead, he reasonably treated the 2012 class (where only one student failed) differently from the 2011 class (where multiple students failed).[8]

Rollins contends that Dr. Louis also lied to the Faculty Council when he stated that Rollins' final grade in Dental Anesthesia included a ten percent credit for clinical injections. Rollins claims that the injections accounted for only five percent of his grade. If the credit had been ten percent as Dr. Louis stated, Rollins claims that he "would have likely passed DA if his exams were graded properly." As discussed in more detail below, Rollins has not identified any evidence that he

_____

[8]    Rollins also references Dr. Louis' decision to curve the grades in his 2013 Dental Anesthesia class. However, Dr. Louis made his presentation to the Faculty Council in 2012. The decision that Dr. Louis made a year later is not relevant to a discussion of the "accepted academic norms" at UAB in 2012.

was entitled to higher scores on either the mid-term or the final exam in Dental Anesthesia. Moreover, Rollins' speculation about his Dental Anesthesia grade was insufficient to withstand summary judgment.[9] *See Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1318 (11th Cir. 2011) ("At the summary judgment stage, such 'evidence' consisting of one speculative inference heaped upon another, was entirely insufficient.").

## F.      Dr. Louis' Failure to Attend the APC Meeting

Continuing with his criticism of Dr. Louis, Rollins argues that Dr. Louis' failure to attend the APC meeting or send a representative or letter constitutes a substantial departure from the norm. But yet again, Rollins fails to identify any evidence in the record to support this argument. Under *Ewing*, the departure from accepted academic norms must be so substantial that it "demonstrate[s] that the person or committee responsible did not actually exercise professional judgment." 474 U.S. at 225. Rollins does not dispute the district court's conclusion that Dr. Louis was not required to attend the APC's meeting. Further, Dr. Louis was not a

---

[9]      Rollins further argues that Dr. Louis significantly departed from academic norms by refusing him access to the exams that he took in Dental Anesthesia. He asserts that other professors allow students to review their exams after the professor has graded them. This issue is moot now that Rollins has received copies of his Dental Anesthesia mid-term and final. Additionally, the Constitution does not require that educational institutions give students due process for every single decision made by an educator. The fact that Dr. Louis had a different policy than other professors does not entitle Rollins to the relief sought.

25

member of the APC, and there is no proof that his absence affected the committee members' ability to exercise their professional judgment.

### G.    Grade Appeal and Grading Inconsistencies

Likewise, Rollins does not contest the district court's conclusion that he failed to complete the third and final step of his grade appeal – an appeal to Associate Dean Tilashalski.[10]  Rather, he claims that further pursuit of this appeal was futile.  Rollins appears to offer this information more as an explanation than an argument.  However, the fact that he abandoned pursuit of his due process rights does not justify a due process claim against the Board of Trustees or Dean Reddy.

Even though Rollins abandoned his grade appeal, he now seeks to challenge his Dental Anesthesia grade in this Court by comparing his exams with the exams of other students.  Rollins claims that the only credible explanation for discrepancies is grade manipulation.  Notwithstanding this argument, Rollins does not point to any proof in the record that intentional grade manipulation occurred. Instead, he contends that, based on Dr. Ramp's testimony, a course master *could* manipulate grades.  At the summary judgment stage, such speculation cannot salvage Rollins' claims.  *See Josendis*, 662 F.3d at 1318.

---

[10]    Rollins does claim that he actually initiated his grade appeal on June 4, 2012, and that Dr. Louis drafted a denial e-mail on June 11, 2012, but never sent it.  Regardless, Dr. Louis sent Rollins an e-mail denying his grade appeal on June 30, 2012.  Rollins admitted during the injunction hearing that he received that e-mail.

As for the three alleged discrepancies in the exam grading, two are from the Dental Anesthesia mid-term given during the spring of 2012. However, because Rollins answered both of the disputed questions incorrectly, he was not entitled to receive credit for either question.[11] The fact that Comparator Two received credit for similar incorrect answers does not constitute a due process violation.

Rollins has only identified one grading inconsistency on the final exam. But that discrepancy is based on a comparison of his 2012 exam with another student's 2011 exam. Even though the disputed question is the same, Dr. Louis might have given credit for a wrong answer in 2011 if the entire class performed poorly on that question. As with the mid-term exam, Rollins was not entitled to credit for an incorrect answer. In short, the minor grading discrepancies Rollins identifies do not amount to "substantial departures from accepted academic norms." Instead, Rollins' exams only underscore the fact that he did not adequately grasp Dental Anesthesia, an obviously important subject for any potential dentist.[12]

---

[11] Comparator Two received 1.45 points when she answered "buccal" on one question, but Rollins received no points for the same answer. Dr. Louis stated that both Comparator Two and Rollins answered the question incorrectly and attributed the discrepancy to a "computer glitch." On a different mid-term question, Rollins answered "6-7." Comparator Two answered "8-9." The correct answer was "10-11." Comparator Two received credit for the answer, but Rollins did not.

[12] The only issue that Rollins raises in his appellate brief is the district court's summary judgment decision. However, Rollins also questions the district court's denial of his motion to compel the production of all of the Dental Anesthesia exams from the spring of 2012. This Court reviews a district court's decisions regarding discovery motions, including the denial of a

27

## H.    Waived Procedural Challenges

Finally, Rollins alleges the following procedural deficiencies: (i) Dr. Louis failed to prepare a Deficient Grade Report Form; (ii) the Faculty Council did not cast the same number of votes for each first-year student it reviewed; (iii) the council's discussion prior to voting defeated the purpose of a secret ballot; (iv) the motion to dismiss Rollins was not seconded before the council voted; and (v) the council voted to affirm the APC's recommendations when the guidelines require them to vote for or against the Associate Dean's decision.  Notably, Rollins did not make these arguments in his motion for summary judgment, nor were they discussed in the district court's resulting opinion.  In this regard, we note that, "an issue not raised in the district court and raised for the first time in an appeal will not be considered by this Court," especially where the issue involves a factual

---

motion to reopen discovery, for an abuse of discretion. *Artistic Entm't, Inc. v. City of Warner Robins*, 331 F.3d 1196, 1202 (11th Cir. 2003).

In his "Motion in the Spirit of Rule 56(d)," Rollins admits that before the close of discovery, he received some of the Dental Anesthesia exams, including his mid-term and final exam, the exams of Comparators One and Two, and one student's exams from 2011.  However, Rollins waited until after the discovery deadline to move the Court to compel all of the exams.

The record of this matter clearly demonstrates that the parties were given sufficient time to complete discovery.  It contains thousands of pages of data, correspondence, and testimony. Further, the district court granted several discovery extensions and ultimately extended the discovery period for more than eight months.  And, as discussed above, Rollins has not proven that other Dental Anesthesia exams would likely have aided his case.  With the four exams in his possession, Rollins has not discovered any instance where he answered a question correctly but was not given full credit.  Accordingly, the district court did not abuse its discretion when it denied Rollins' request to further extend the time for discovery.

28

question.  *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) (quoting *Walker v. Jones*, 10 F.3d 1569, 1572 (11th Cir. 1994) (internal quotation marks omitted)).  Even if these arguments were properly before this Court, the academic guidelines do not require any of the procedure that Rollins claims he was denied.[13]  And even if the guidelines did contain such procedural requirements, Rollins' due process claims still fail.

To avoid summary judgment on these issues, Rollins needed to offer some proof that the decision to dismiss him was not "careful and deliberate."  *See Horowitz*, 435 U.S. at 85–87.  Proof that the university committed trivial violations of its internal policies is insufficient to meet that standard.  Rollins not only received due process from the university, but he also received significantly more process than the Constitution requires.  Even though the Supreme Court has held that a formal hearing is not necessary for academic decisions, the university held a formal hearing during which Rollins testified on his own behalf, called witnesses,

---

[13]    (i) The guidelines merely state, that when remediation is offered, the course director "can" use the Deficient Grade Report Form.  Rollins was not offered remediation, so there was no reason to fill out the corresponding form. (ii)  The council's votes on Comparator Two and Rollins were unanimous.  Rollins does not explain how one less vote in his favor or one more vote for Comparator Two would have made a difference. (iii)  The guidelines specifically require the council to hold a closed discussion after hearing testimony.  (iv)  The guidelines only require a "motion for or against the Associate Dean's decision."  They do not require a second. (v)  The fact that the council moved to uphold the APC's decision rather than the Associate Dean's decision is inconsequential since the Associate Dean, Dr. Tilashalski, openly agreed with the APC's decision regarding Rollins.

29

and was allowed to have an adviser present.  In fact, Rollins received more process than the students in *Horowitz*, *Haberle*, or *Ewing*.

## V.

Rollins claims that the Board of Trustees violated his equal protection rights under Title IX of the Education Amendments Act of 1972 and Title VI of the Civil Rights Act of 1964.  Title IX prohibits discrimination on the basis of sex, while Title VI prohibits discrimination on the basis of race.  20 U.S.C. § 1681; 42 U.S.C. § 2000d.  To maintain an equal protection claim, a plaintiff must allege that, "through state action, similarly situated persons have been treated disparately." *Draper v. Reynolds*, 369 F.3d 1270, 1278 n.14 (11th Cir. 2004) (internal citation and quotation marks omitted).  Further, the plaintiff must present evidence that the state actor's conduct was motivated by the plaintiff's race or sex.  *See id*.  *See also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66, 97 S. Ct. 555, 563, 50 L. Ed. 2d 450 (1977).  In other words, the plaintiff must demonstrate discriminatory intent.  *Vill. of Arlington Heights*, 429 U.S. at 265–66.

### A.    Alleged Sex-based Discrimination under Title IX

Rollins acknowledges that he ranked third to last in his class. Notwithstanding his academic standing and performance, he asserts that UAB denied him equal protection when it dismissed him instead of Comparator Two, a white female who ranked second to last in the class.  To succeed on an equal

30

protection claim based on circumstantial evidence, a plaintiff must prove that a "nearly identical" comparator received different treatment. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004). And Rollins' Title IX argument is entirely circumstantial.

The district court properly refused to second-guess UAB's reasonable decision because Rollins did not show that Comparator Two was "nearly identical" to him. According to the district court, the students were not "nearly identical" because Comparator Two "had a better overall record." The district court reasoned that Comparator Two only needed remediation in one class, whereas Rollins failed Dental Anesthesia and would have failed Gross Anatomy but for the retest. Further, Rollins failed the first two exams in Fundamentals I, a course he had taken in graduate school.

Rollins insists on appeal that his academic record was better than Comparator Two's record. He relies on his higher GPA, slightly higher class rank, and lower number of C-grades (three versus five) to support this argument. Nevertheless, these statistics do not refute the district court's proper conclusion that Comparator Two and Rollins were not "nearly identical." Significant distinctions still exist between the academic records of Comparator Two and Rollins.

Courts have found that comparators are not similarly-situated based on even fewer distinctions. In *Watson*, 463 F. Supp. at 722, an African-American student was dismissed from medical school for poor academic performance. The student demonstrated that a white student with lower grades was granted a leave of absence in lieu of dismissal. *Id.* at 727 n.3. Nevertheless, the court held that the students were not similarly-situated because the comparator had undergone therapy for a psychological condition during his first year of medical school. *Id.*

In the present case, Comparator Two asserted that her grades were impacted because her mother suffered a heart attack during the school year, requiring the student to return home for a few days and miss classes. Comparator Two also testified to a health condition that affected her academic performance during both semesters. The only personal issue Rollins raised during his testimony was his engagement to be married. These differences adequately demonstrated that Rollins and Comparator Two were not similarly-situated.

Likewise, Rollins did not present any direct evidence of discriminatory intent. According to Rollins, the fact that UAB allowed two female students (Comparators One and Two) to remediate while it denied him the same opportunity is sufficient proof of discriminatory intent. Again, however, the district court properly disagreed. Just as Comparators One and Two were allowed to take a retest when they failed Cardiovascular-Renal, Rollins was also allowed to

32

take a retest in Gross Anatomy.  In other words, he received the same opportunity as his female counterparts.  In short, Rollins has offered no direct evidence of discriminatory intent nor has he proven that he and Comparator Two were similarly-situated.  Therefore, the district court did not err by granting summary judgment in the defendants' favor on Rollins' sex-based discrimination claim.

## B.    Alleged Race-based Discrimination under Title VI

Rollins also contends that he was dismissed from the dental school as a means for the school to "offset" the dismissal of Comparator One, an African-American female.  As proof of discriminatory treatment regarding his Title VI claim, Rollins first observes that the APC and Faculty Council were informed about his failure to meet the retest standard in Gross Anatomy, but did not know about Comparator One's failure to meet the Cardiovascular-Renal retest standard. Even assuming that Comparator One was not eligible for the retest as Rollins asserts, that fact does not help his case.  Comparator One failed the retest as well as the course.  And like Rollins, she was also dismissed from the dental school.  In short, Rollins cannot prove disparate treatment by comparing himself to a student who received the same treatment.

As direct evidence of discriminatory intent, Rollins offers the affidavits of Dean Reddy and Dr. Tilashalski, originally filed in Comparator One's separate discrimination suit against UAB.  In his affidavit, Dean Reddy states that, "[a]t

33

approximately the same time as [Comparator One's] dismissal, the [dental school] also dismissed a white male student whose academic performance was inadequate, but better than [Comparator One's]." Dr. Tilashalski's affidavit contains a similar statement. Rollins relies on these affidavits as proof that he was dismissed from the dental school "based on his race in order to justify or defend . . . the dismissal of this black female student." While correctly construing the evidence in a light most favorable to Rollins, the district court still found that, "the affidavits fail to establish that the [dental school] dismissed Rollins in anticipation of creating a defense to a then non-existent lawsuit." The affidavits only mention Rollins to rebut Comparator One's contention that racial animus played a role in her dismissal.

In response, Rollins offers nothing but bare assertions, devoid of any factual support. He contends that, "Tilashalski concluded that Comparator One, the last-ranked student in the freshman class, had to go." Rollins then claims that he was dismissed as a racial offset to avoid a lawsuit. But the record only contains contrary evidence. When asked during his deposition if he believed that Comparator One "really needed to go," Dr. Tilashalski responded, "I certainly didn't think she could be successful moving through the curriculum." Then, the following exchange ensued:

Q. . . . I guess it would be awfully convenient that at the same time
[Comparator One] was dismissed that Lee Rollins was dismissed,
wasn't it?
A. I don't find any of this convenient. . . .
Q. It helps balance off a black female who got dismissed if at the
same time you got rid of a white male?
A. That's certainly not my thought process.
Q. Was it ever your thought process?
A. No, sir.

Rollins has offered no direct evidence that contradicts Dr. Tilashalski's deposition testimony. Thus, the district court rightly rejected his claim that Dr. Tilashalski was motivated by racial animus.

The only other evidence that Rollins offers in support of his discrimination theory is the testimony of Drs. Ramp and Eleazar. According to Rollins, these witnesses testified that "race certainly entered into their thought processes at the APC." When asked about Comparator One's dismissal, Dr. Ramp stated during her deposition that, "I'm sure race went through my head." However, the district court concluded that her statement was not sufficient to establish racial animus. We agree.

The record does not support Rollins' contention that Dr. Ramp harbored any discriminatory intent. In fact, the record reflects that just the opposite was true. Dr. Ramp ardently opposed Rollins' dismissal. As the district court observed, Dr. Ramp testified at the Faculty Council meeting on Rollins' behalf and chose to abstain from voting on Rollins at the APC meeting. Dr. Eleazar also admitted

35

during his deposition that he "weighed the race of [Comparator One] in [his] deliberation." He explained that "it would be difficult to dismiss a black female and promote a white female or white male." Dr. Eleazar further agreed that dismissing Rollins, a white male, did balance out the dismissal of Comparator One, a black female. However, Dr. Eleazar voted at the APC meeting for all three students to repeat the year. Based on this undisputed evidence, the district court properly concluded that Dr. Eleazar's "testimony only supports the reasonable inference that he wanted to ensure that the APC treated all three students similarly" because of their similar academic records.

The district court further concluded that Dr. Eleazar only considered race because he wanted to make sure that all students were treated similarly, regardless of their race. Once more, Rollins offers nothing to rebut the district court's analysis. Dr. Eleazar can hardly be accused of harboring discriminatory intent when he voted against Rollins' dismissal. Moreover, as discussed earlier, Rollins cannot base an equal protection claim on evidence that he received the same treatment as a comparator. Both Rollins and Comparator One were dismissed from the dental school. Tilashalski voted for both of them to be dismissed. Dr. Ramp advocated for both of them to remain students, and Dr. Eleazar voted for both of them to repeat the year. Because Rollins did not offer any evidence of disparate

36

treatment, the district court did not err by granting summary judgment in favor of the defendants on Rollins' equal protection claims.


## VI.

The district court properly concluded that there are no genuine disputes of material fact.  Further, it did not err when it granted summary judgment for the defendants.  Accordingly, the district court's judgment is **AFFIRMED**.